## J. A. BENNETT V. THE STATE.

No. 1853. Decided November 16, 1898.

**1. Opinion Evidence—Shorthand Rendering of Facts.**

On a trial for murder, where the question propounded to the witness was "Just state exactly what their conduct towards each other was," and the answer was, "They acted at one time like they were sorter mad," and it was objected that this was opinion evidence, Held, it is sometimes difficult to state the manner and bearing of a person or persons on a certain occasion without giving an opinion. This is called "a shorthand" rendering of the facts, and in such cases the opinions of the witnesses are admissible.

**2. Witness—Cross-Examination as to His Secret Reasons.**

On a trial for murder, where a witness had testified to damaging statements made to him by defendant before the homicide, and that thereafter, in the interview with defendant, he wanted to leave the impression on the defendant that he would not tell what he knew, and he was asked on cross-examination his reasons for desiring to leave such an impression on defendant, which was objected to by defendant, because the secret reasons of the witness could not be evidence against defendant, would prejudice the rights of defendant, and were immaterial and irrelevant, which objections were overruled and the witness permitted to answer, that the reason he wanted to leave the impression on the defendant that he would not tell was because he was afraid of defendant, and further, that defendant had threatened him if he disclosed it, Held, that while the fact that he desired to leave such impression on the defendant may have been legitimate, this would not justify the State in proving a secret reason on part of the witness in the endeavor to impress upon the mind of defendant that he would not disclose inculpatory conversations. However harmless might be such evidence if the reasons were of themselves indifferent, yet under the circumstances of this case they were clearly prejudicial to defendant, and were inadmissible.

**3. Evidence—Sheriff's Statement as to Arrest.**

Unless such evidence can be made relevant and material by some peculiar circumstance or condition of the case, it is error to permit the sheriff, as a witness, to detail before the jury the efforts and inquiries he made to ferret out the perpetrators of the crime for which the defendant is on trial, and particularly is such proof incompetent in cases of circumstantial evidence.

**4. Same.**

Note circumstances of a case under which it was error to permit the State to prove that upon his arrest the defendant waived examination and had since remained in jail.

**5. Same—Defendant's Silence as Inculpatory Evidence.**

The general rule, succinctly stated, is that when the circumstances surrounding the statement of one to another who is accused of a crime are such as to reasonably expect or require the latter to answer or respond, his silence may be taken against him. But note state of case disclosed in the opinion held not to bring the impugned proof within the rule.

**6. Same—Charge of the Court—Alibi—Murder of the First Degree.**

The charge of the court having presented the issue of alibi, and charged on circumstantial evidence in substantial accord with decisions of this court, it is held that in view of the peculiar condition of the evidence, raising the issue of suicide by deceased, the court erred in refusing the additional charge requested by defendant, to the effect that "if it is possible for you to arrive at any other reasonable conclusion or hypothesis from the testimony than that of the guilt of the defendant, you will find defendant not guilty."

**7. Same—Murder of Second Degree—When to Be Charged.**

Where the evidence of the killing is purely circumstantial, and there is an absence of proof to show the design with which the act was conceived or executed, the law of murder of the second degree should be given in charge.

**8. Same—Murder of First Degree—Malice Aforethought.**

A killing with a sedate and deliberate mind is not murder of the first degree unless attended with a malicious intent formed to kill in a sedate, deliberate, and cool mind. Though the charge in this case had correctly defined malice aforethought in a preceding part of the charge, the charge on the issue in applying the law to the facts was subject to the objection urged against this omission.

**9. Evidence—Postponement of Trial.**

A material witness for the State having testified on the trial that the defendant told him that he had frequent intercourse with deceased, the bill of exceptions shows that said witness, after testifying, told defendant's counsel that he had not intended to make any such statement; that defendant had told him no such thing, and promised to be present next morning to correct his said testimony, but did not appear. The defense asked for delay of one day to procure the return of said witness. The court refused the delay, and refused to permit the defense counsel to testify to what the witness told him. Under the circumstances of the case, the question of carnal intercourse between defendant and deceased being an important issue, the court erred in refusing the requested postponement.

APPEAL from the District Court of Hill. Tried below before Hon. J. M. HALL.

Appeal from a conviction for murder in the first degree; penalty, imprisonment for life in the penitentiary.

The important facts developed in the evidence are fully stated in the opinion of the court, and the questions assigned for error are also so fully set forth in the opinion as to need no further illustration.

*Wear & Parr* and *Smith & Phillips,* for appellant, filed an able and exhaustive brief and argument.

*W. W. Walling* and *Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life, and he appeals.

In order to present the legal questions, and show their bearing and importance, we will give a summary of the facts proved; and in this connection we here insert a map of the scene of the homicide, together with the surrounding country:

1, route said to be traveled by defendant going to and from scene of homicide; 2, route traveled by defendant in going to meet Hanks; 3, route traveled by deceased in going from Blum to place of homicide; 4, where Walter Wheeler met defendant, and rode with him about 100 yards.

The deceased, Mary Jenkins, lived with her husband on a farm in Hill County, several miles west of the town of Blum. There was also, as a part of the household, her brother-in-law, Rufus Jenkins, and her father, Mr. Boutinier, and a small child. Her husband conducted the farm, and she appears to have been a book agent, and was in the habit of selling books in the neighborhood, sometimes going in a buggy, and sometimes on horseback. She was evidently a woman of some culture, and her relations with her husband do not seem to have been pleasant. The defendant was a single man, and lived with a relative in the same neighborhood, some three or four miles from the home of the deceased. The

record does not inform us that he had any settled employment. He was in the habit of riding about through the neighborhood, and generally carried a Winchester gun with him in his rounds. The testimony for the State tends to show that for some time antedating the homicide, perhaps a year, he was on terms of intimacy with deceased. On Friday morning, December 27, 1895, the husband of deceased and Rufe Jenkins, his brother, went in a wagon several miles northwest of where they lived for the purpose of getting a load of wood. Both going and returning, their route carried them withing 150 or 200 yards of where the body of deceased was subsequently found. Before they left home, Rufe Jenkins saddled a roan horse, placing thereon his brother's saddle, to be used by deceased that morning to ride to Blum, some four or five miles east or northeast of their home. Deceased was seen in Blum by several parties, who testified in the case, during that morning, and while there purchased a quart bottle of whisky, the same being in a flat white flask. Between 1 and 2 o'clock she went to the house of one Nancy Gibbs, in Blum, riding said roan horse, and had with her, at the time, a satchel, and also the flask of whisky. While here she proposed that Mrs. Gibbs should read a letter which she had written, but had not sealed, but, being interrupted, she put it back in her satchel, stating that she would let her read it some other time. She left here, evidently on her way towards her home, between 1 and 2 o'clock. The testimony does not show that she was afterwards seen alive, unless the person Walter Wheeler saw riding about 100 yards ahead of defendant, in the direction of the cedar brake, where her body was found, was the deceased. Tracks of her horse were traced from Belknap, down the Blum and Kimball road, and thence northwest to the brake, where her body was found. The horse appeared to have stopped about twenty steps from where the body was found, and there the deceased's tracks were seen. The horse was traced from this point out into the lane leading to Vedders'. Witness Wheeler saw defendant at the crossing on Belknap as he was going down to the Gwinn place. He states that, as he was going along the road, he saw defendant coming up from below the crossing, leading his horse up the bank of Belknap Creek; that he came into the highway, and they rode together a piece, going in the direction of the high house west of Blum. This, he says, was between 1 and 3 o'clock; that defendant, after riding with him a short distance, loped off; ahead of him about 100 yeards was some person going in the direction of the brake; that he did not recognize the party, and did not know whether it was a man or a woman. On that Friday evening, late, the horse ridden by the deceased, with the saddle on, and bridle thrown over the horn of the saddle, was seen at Vedders', which is about three-fourths of a mile up the lane east of where the body was found. This was some time about 4 o'clock. The deceased not returning to her home on Friday night, search was made by her husband and others early on Saturday, and some time in the evening her body was found in the brake, as shown on the map, about two and a half or three miles west or northwest of Blum. When found, she was lying on

her back, in a little open space, surrounded by cedars, about 200 yards from the nearest road. Some bushes intervened between where she was lying and the road. It is possible, however, that one might be seen lying as she was, from the road. She was lying on her back, the ground at that point being slightly inclined, and her head a little down, her feet about ten inches apart, her hands lying by her side, her dress apparently orderly arranged, a bullet hole through her head. It had penetrated about an inch above the right ear, and had come out near the top of the skull. The hole indicated that it was a 44 or 45 caliber bullet which inflicted the wound. About fifteen steps west of her body was discovered the place where the horse had evidently been hitched, and rather north, about fifteen or twenty feet, her satchel, gloves, and hat were found. The satchel was open, and some papers scattered around. Also, in that same vicinity, her husband's coat, which she had carried with her, was found lying on the ground. The bottle of whisky was not found. The pistol was found on her body, the breech lying on and across her right thigh, and the muzzle on her left thigh, or between her legs. The pistol was a 45 caliber, and belonged to her husband, though it is not shown how or when she procured it. The cylinders contained four loaded cartridges. One chamber was entirely empty, and one contained an empty shell. There was some proof tending to show that this chamber had been recently fired. Under her head and right shoulder was a large pool of blood. Around the wound in her head there was blood, and the wound itself was shown to be powder burned, and also her right ear. One witness also states that he saw a spatter of blood on her right hand. The State's testimony tends to show that the tracks of a man and woman were found withing fifteen or twenty steps of the body. Two or three days after the discovery of the body, tracks of a barefooted horse were traced from the body in a northerly direction, to the pasture fence; thence across the fence in a zigzag course, through the brush in the pasture, until they entered the lane, being the Cleburne and Kimball road, at a point east of the body. These tracks were found going and coming, and the testimony for the State tended to show that they were the tracks of the defendant's dun mare, which he was shown to have ridden on that day. The State's theory was that deceased was shot between 3 and 4 o'clock on that Friday evening, and that appellant was the guilty party. About 2 o'clock Mrs. Mattie Bomar saw the defendant watering his horse in the branch about 100 yards southeast of the body, near the road. She passed him at this point, and went on, and continued traveling south. He shortly followed on, passed through the open glade just below the brake where the body was found, and then turned in a southeast direction, going towards Blum. Dr. Hanks testified that he met defendant, by appointment, on that day on the Blum and Kimball road, fifty or seventy-five yards from the old tall house, as shown on the map. He states this to have been about 2 o'clock. He asked defendant to deliver a message for him to the Stanley boys, concerning a contract. Defendant said he could not do it in the next two or three hours, as he had an

appointment with Mrs. Jenkins, but after that he would deliver the message. He did not say where he was to meet Mrs. Jenkins, but left, going in the direction of Blum. The witness Walter Wheeler saw defendant at the crossing of the Belknap, some time later in the evening. As heretofore stated, when he first saw him, appellant was below the crossing, coming up the bank leading his horse. He came up, and joined witness, and rode with him about twenty-five yards. Witness rode on due west, but observed defendant for half a mile, going in the direction of the old high-top house, which is towards the brake where the body was found. Appellant left him in a lope, and witness also saw another party ahead of defendant, who was also riding in a lope. It will be observed that this witness did not identify defendant, but stated that he was riding a dun horse. (The defendant, however, in his testimony admits that he was the party.) A witness states that he passed along the road within 200 yards of where the body was found, between 3 and 4 o'clock, and heard a shot fired in that direction, which must have been the shot which killed deceased. Defendant was seen again by Mrs. Raines, who lived about three-fourths of a mile east of where the body was found, at 4:20 o'clock by her timepiece, which she said was a little fast. He stayed all night with Tom Bigham, who lived about three miles from Blum, and a short distance from the Raines place. He came there about a half hour before sundown, riding a yellow mare, and having a Winchester gun with him. He also had a flat quart bottle about two-thirds full of whisky.

As stated before, the motive of the killing assigned by the State was on account of the alleged intimacy existing between the defendant and deceased. This relationship was proved by several witnesses, and, according to Dr. Hanks, a short time before the homicide defendant told him that he was in serious trouble with Mrs. Jenkins, and that he would leave the country if it was not for a matter of settling a fine at Cleburne, which would give him trouble as sure as he undertook to leave. He said he was too damned thick with the woman, and that John Jenkins, her husband, was about to catch up with him. This witness also states that he met defendant after it was learned that Mrs. Jenkins was missing, and before her body was found; and that defendant told him that he must never tell that the evening before he had told witness that he had to fill an engagement with Mrs. Jenkins; that he told witness, if he valued his life at anything, he must not tell that. The State also introduced some evidence showing a slight altercation between the defendant and deceased at a party a short time prior to the homicide, but it was shown they were afterwards on friendly terms.

The defendant, besides relying on the weakness of the State's case to connect him with the homicide, also insisted that the facts indicated suicide on the part of the deceased, and he also relied on and introduced evidence of an alibi. He accounted for the tracks of horses seen in the immediate vicinity of the homicide in several ways: First, by evidence tending to show that two of the neighbors passed that way on the 25th of December, on horseback, hunting. Further, that where the body was

found was in an open space, and horses and animals were loose in that country, and were liable to have made the tracks. As to the tracks going through the pasture from north to south, which the State showed by its testimony to closely resemble the tracks of the defendant's horse (and which he admitted were his), he introduced proof showing that he passed through that pasture, and came out at a point in the fence just north of where the body was found, and passed along close where the body was found on the day of the homicide, prior thereto. With reference to the tracks, it is also shown by appellant that the ground around the body, and in the direction of the pasture and inside the pasture, presented a hard rocky surface, and that it would be difficult to identify and trace tracks in such a country. Appellant introduced evidence accounting for himself on that day, tending to show that he was not in the vicinity of the place of the homicide later than about 2 o'clock, when Mrs. Mattie Bomar saw him watering his horse about 100 yards below there; that she saw him as he went south from there; and that there is no evidence on the part of the State showing his return to that point. And he further insists that there was no attempt to prove any tracking of appellant's horse into the brake where the homicide was committed, approaching it from the south or southeast, showing that he did not follow the woman into the place where her body was found; that from the time he was seen by Walter Wheeler until he was next seen by Mrs. Raines (which he says was not later than 3:50) it was impossible for him to have gone from the point at which Wheeler saw him to the place of the homicide, through the pasture, as suggested by the State, and have returned that way, and then to have come back through the Buchanan lane, where he was seen by J. W. Bennett between 3 and 4 o'clock, and have gone to Mrs. Raines', and been there at 3:50 p. m.; that he would not have had time to make said trip, and commit the homicide in the interim. Appellant himself testified as to his whereabouts during this time. He states that on that day, between 12 and 2 o'clock, he came through the Caruthers pasture, and came out of the same just north of where the body was found the next day; that staples were out of the fence at that point; that he pulled the wire down, stepped on it, and let his horse over; that he stopped his mare to drink in the branch a little distance from the road, about where they claim to have found the body of Mrs. Jenkins; that Mrs. Bomar passed him there; that he turned back into the road, and went on south, and met Dr. Hanks, near the old high house; that Dr. Hanks told him that the note he had promised had not been fixed up, and arranged to meet him again the next morning; that Hanks asked him to see the Stanley boys for him at Charley Raines' in a half hour, but he told him he had to go to Blum, that he expected some money at the express office, and that he promised to meet his brother-in-law, Patrick, at Noland River, as he was coming out from Blum; that he would deliver the message in two hours; that when he left Hanks it was about 2:10 o'clock; that he proceeded in the direction of Blum, as far as Belknap Creek, about a mile; that he then turned down the creek some

twenty steps, watered his horse, and answered a call of nature. He there decided not to go to Blum, but would deliver the message of Hanks to the Stanley boys at Raines'. When he came out into the road from the creek he overtook the little boy Walter Wheeler, and rode with him about 100 yards, then loped off and left him, and came into the Buchanan lane, and followed it until he got to the Blum and Bluff Mill road, that leads north, and went on to Raines' house. He inquired for the Stanley boys, and was informed that they had left there, and had been gone about two hours; that Mrs. Raines told him that it was then about 4:20. That he went from there to Bigham's and stayed all night. The distance from the mouth of the west end of the Buchanan lane to the place where the body was found is not stated, but we take it, from other distances in that vicinity, that it must have been at least half a mile. Appellant in his own testimony denied specifically the conversation attributed to him by Dr. Hanks with reference to his engagements to meet Mrs. Jenkins on that day, and also that he stated to Hanks, previous to that, that he was in trouble in regard to her. He also showed by testimony that the whisky he had in the flask that Friday night at Bigham's his brother-in-law, Patrick, had bought for him at Blum on the 26th; that he brought it to him from Blum in a round black bottle. When he left home on the morning of the 27th, he poured the whisky out of the black round bottle into the white flask, because Patrick desired to preserve the black bottle. And in this way he proposed to dispose of the incriminative circumstances of having a bottle of whisky at Bigham's on that night. In this connection, as a part of the State's evidence in regard to the whisky, we would observe that the State proved by the witness Bill Hudson that he met appellant on that Friday morning, and asked him for a drink of whisky, and appellant replied that he had an apple; that he looked in his saddle pockets, but did not see any whisky. Appellant, however, stated that the bottle of whisky was not then in his saddle pockets, but in his overcoat pocket, which was tied on behind the saddle. He did not inform Hudson of this.

In addition to this, defendant introduced a letter written by deceased to her mother, and found near the body of deceased, evidently taken from her satchel, for the purpose of establishing the theory of suicide. We copy said letter, as follows: "Blum, Hill County, Texas, December 26, 1895. Dear Mother: After so long a time I will try to write you, and let you know how things are moving. I had a dull Christmas, although we had some extra; but everything on the place had the mulligrubs, and so we staid at home all day, although we had several invitations to big dinners. But late in the evening Jose and I hitched up and went to a dance, just to change the program. As I promised to tell you, if I ever got to be better satisfied to live here than when you were here, so now I will tell you how I feel. For a while, year after you left, my life seemed the most wretched and miserable in the world. Everything went wrong and seemed dark and unhappy. Then, in the spring, the old lady left us, and went to California, and, being with my duties entirely at my

will, I lived with brighter hopes, and strove hard to busy myself pleasantly and profitably, and I to a certain succeeded financially and socially, for my business, teaching, canvassing, and writing work, has been above the average; making a profit sufficient for my expenses after dividing with Josie, which, of course, I felt it my duty, as she is under my care, and I have tried to be a sister and mother to her, and that care and responsibility has worried me greatly. Now, as to the complaint I then made, I can say that I have had twenty-six women to visit me in the last sixteen months. Two of them came only once, four only twice, and the rest several times; so you see I can not complain on that score. And I have more conveniences and nice furniture and fixtures for my house than anybody in the country of our means. I now have a buggy of my own, and a horse almost at my command. Yet, with all these, I am not happy. Although I can not say that my husband is really cross to me, for he never curses and raises the devil about things like I do, but seems to be easily influenced by others, was beyond the santing and sull-ing, and often without any one knowing the cause. And, dear mama, I really feel like he does not appreciate me or anything I do, for he never praises me for anything I do, and the harder I try to please, and the very thing I am surest will please, is always certainly received with contempt. He cares nothing for my pleasure, or, at least, it so seems to me, and but little for my comfort. He rarely goes in company with me, and then unpleasantly and unwillingly, and after much coaxing. Now, to picture the other side for myself. You know my disposition better than I can tell you; being impulse, ambitious of a certain nature, subject to despondency and indiscretion; loving happiness, pleasure, and society, of which I am entirely destitute, I tried to be self-sacrificing, but my nature will not let me be wholly so. And after disappointment or family feeling, I find I am somewhat lonely, and all around feel the effect. And, oh! so often do I prefer death to my life! I do not ex-pect a woman of responsibility, as all wives should be, to lead a life of pleasure, without trouble or sorrow, for I know there is not sweet with-out a bitter; but it seems to me my bitter far overdoubles my sweet, and life really seems a burden. Possibly I painted a married life too high, and I await your decision. This is my picture: I painted it to be one of love, intermixed with cares, sorrows, troubles, pleasures, poverty, and prosperity, each equally shared by mates bound by true love, sym-pathy, confidence, and affection. Oh, alas! how different is mine! I receive, neither do I always give; and, oh, so against my nature. Dear mother, is this the life to lead? Tell me, if my picture was too gay; if I am too selfish, or what step should I take to bring about these heart's desires, or even lighten my burden. If this seems a cloud, only think of me that dark clouds are always near. Dear mother, I regret such a let-ter to you, lest it grieve me. And honest, my negligence in writing to you, is I have waited to find things pleasant as possible, that my letter be not too glum, and, finding myself and others as pleasant to-day as is ever the case, I endeavor to communicate my trials, and ask your moth-

erly interest and kindness in the matter. There are so many things more I desire to say that it is difficult to write the feeling I wish to express, and I hope a letter from you will cheer me."

The record affords other circumstances, more or less criminative, of appellant, and also testimony on his part explaining or denying such inculpatory circumstances. We have above enumerated the main features of the testimony pro and con, and will now proceed to a discussion of appellant's bills of exception.

Appellant excepted to the action of the court in permitting the State's witness Dan Wooten in answer to the question, "Just state exactly what their conduct was toward each other," to state, "They acted at one time like they were sorter mad." The court explains this by stating that it was afterwards shown by this witness that appellant and deceased danced together at the same party on that night. But it does not occur to us, if there was error in permitting the question to be answered, as was done, that it was cured by showing that the parties subsequently made up. The question itself was calculated to elicit facts. The answer, however, appears to involve an opinion or summing up of the witness. While it would always be best to state the facts occurring, still it is sometimes difficult to state the manner or bearing of a person or persons on a certain occasion without giving an opinion. This is sometimes called a "short-hand" rendering of the facts. In such cases, the opinions of witnesses appear to be admissible. Powers v. State, 23 Texas Crim. App., 42; Meyers v. State, 37 Texas Crim. Rep., 208.

When J. M. Hanks, who was a material witness for the State, was on the stand, he was asked by the State, "Why was it you wanted to leave the impression on the defendant that you would not tell what you knew?" The defendant objected to the question and answer, on the ground "that the witness' reasons could not be evidence against appellant; and his secret reasons, kept to himself, and pretended now to be stated on the trial, would prejudice the rights of appellant by a statement which is prejudicial to the defendant's rights, and should not be evidence against him; and, further, because said witness' reasons were not material to this case, or to any issue therein, and irrelevant." The court overruled the objections, and permitted the witness to state that the reason he wanted to leave the impression on the defendant that he would not tell what he knew was because he was afraid of the defendant. The action of the court was excepted to. The court in his explanation states that he permitted the testimony, with the explanation that the witness had answered, on cross-examination by defendant's counsel, that he intended to leave defendant under the impression that he would not make any statement; and when the State, on re-examination, asked him why he wanted to leave that impression on defendant, he answered, because he was afraid of defendant. The fact that he desired to leave the impression on the defendant that he would not tell what he (defendant) had told him in regard to the engagement he had to meet deceased on the

day of the homicide may have been legitimate cross-examination, and from what had transpired before in the examination in chief; but, whether that was legitimate or not, it would not justify the State in proving some secret reason that the witness may have had for endeavoring to produce the impression on the appellant that he would not "give him away" as to the conversation. If his reasons were of an indifferent character, not of themselves calculated to injure appellant, the admission of such evidence might be harmless. But here the witness was permitted to state a matter that was calculated to prove highly prejudicial to the appellant. The conversation alluded to and testified to by Hanks was directly denied by appellant. It appears that Hanks did not disclose this conversation until some time after the homicide. As a reason for his failure to disclose this, he was permitted further to testify, that appellant threatened him if he disclosed it. Now, in addition to this, by the action of the court, he was permitted to state, in effect, that appellant was a dangerous man, and would likely execute that threat, and that he was afraid of him, and therefore did not disclose it. We do not believe that the testimony was admissible, and we are further of the opinion that it was hurtful to appellant. Campbell v. State, 30 Texas Crim. App., 645.

When Tom Bell, a witness for the State, was on the stand, the State was permitted to prove by him that he had exercised every effort possible to ferret out the perpetrator of the homicide, and that he had stayed in the neighborhood several days, investigating everybody he could. This was objected to, because it was immaterial and irrelevant, and was merely the conclusion of the witness, and involved transactions and conversations with other persons than the defendant, and defendant was not apprised of what he had done to ferret out the perpetrator of the crime; and, even if he had, it was an argument to the jury and a conclusion of the witness that, after exercising every effort possible that the witness, Tom Bell, who was sheriff, was capable of, he had arrested the defendant, and settled upon him as the perpetrator of the alleged crime, which was clearly prejudicial to the rights of the defendant. It was certainly very commendable in the sheriff, as it always is in matters of this sort, to use every exertion possible to ferret out the guilty party. But that affords no reason why this matter should be paraded before the jury, and such testimony can never be admissible, unless it is made relevant by some peculiar circumstance or condition. As stated by counsel, this character of testimony could not fail to impress on the jury the fact that the sheriff had been diligent. He had exhausted every effort to hunt down the guilty party, and he had finally centered on the defendant, and had had him arrested and indicted. He certainly had very cogent reasons to believe him guilty, and the effect of this testimony was to get before the jury the belief of the sheriff that appellant was the guilty party. This is a case of circumstantial evidence, and the sheriff, in the opinion of the jury, had exhausted every other hypothesis to fasten the guilt on some one else,

and, failing to find anyone else who had done it, therefore he was right in attributing the murder to appellant. This testimony should not have been admitted.

Nor was it permissible, in our opinion, to show, under the circumstances of this case, that appellant when arrested waived an examination before the justice of the peace, and had been in jail ever since. Such testimony might become relevant, but it is not shown to be in this case.

When Charley Raines was on the stand he was permitted to state that the defendant asked him how he thought Mary Jenkins came to her death, and in reply Raines stated that he believed that, if the woman killed herself, there was some other person there to lay her out. This testimony was objected to because "it was the statement of an opinion of the witness Charley Raines, who did not pretend to know anything about the facts in the case; that it was a conversation between the defendant and Raines, and Raines did not say that defendant assented to this theory of witness; it was not shown by the State that this was a statement concurred in by the defendant, but was only pretended to be a statement made by Raines in defendant's presence, and was not shown at all to be a statement by the defendant, nor even that the defendant concurred in it, but was merely a theory of the witness Charley Raines." It is sometimes difficult to tell whether a defendant's silence shall be used as evidence against him; the general rule being that, wherever the circumstances are such as to reasonably expect or require of the defendant an answer or response, his silence may be taken against him. We are not informed here what conversation between the parties had preceded this. The question here presented by defendant to the witness was how he thought deceased came to her death. Ordinarily we would expect, as an appropriate answer to that question, if the witness entertained an opinion as to the manner of her death, that he should have stated it. In reply to the question, however, the witness indirectly states that he did not believe she came to her death by suicide, but that some person killed her; otherwise she would not have been laid out so orderly as the witnesses believe she was. We are not informed that the appellant made any reply to this, but the matter is left in that condition. Isolated as this testimony appears to us, it was evidently an indirect way of getting hearsay testimony before the jury. If, as a fact, deceased's body when found was laid out in an orderly manner, suggesting that some one had been present after her death, it was competent to prove this, as rebutting the theory of suicide. But we are inclined to doubt the authority of the State to prove this matter in this indirect method. If appellant had some further conversation in this connection, it might render this testimony admissible, but, so far as we are advised, he said nothing about this theory of the witness.

These objections are all to testimony. Perhaps some of them, isolated, might not be sufficient to cause a reversal of this case, yet, taken together, they certainly occur to us to have operated to the prejudice of appellant. This was a case depending purely on circumstantial evidence, and it is

difficult, in such case, to tell what effect even a small bit of illegal testimony may operate against a defendant. The scales of justice in such case hang upon a very delicate balance, and illegal testimony that, under other circumstances, might seem to be of no importance, adding its weight to other facts, may become a potential factor in deciding the fate of a defendant. We would not be understood as holding that the matters we have discussed here are of minor consequence, but our observations are intended to suggest the importance of guarding the portals of justice in a trial—especially where the case depends on circumstantial evidence—against the introduction of any illegal testimony, for no man can tell how hurtful such testimony may prove.

The seventh, ninth, and tenth assignments of error bring in review the action of the court refusing to give certain requested charges. In order to present the questions raised by the requested charges, and to determine whether or not they should have been given, we will recite the material portions of the court's charge bearing on the questions raised. The court gave a charge on murder in the first degree. After defining murder in the first degree, and then giving a charge applying the law to the facts on said degree, he gave the following charge on alibi: "Among other defenses set up by the defendant is what is known in legal phraseology as an 'alibi;' that is, if the offense was committed as alleged, defendant says that he (defendant), at the time of the commission thereof, was at another and different place from that where said offense was committed, and therefore was not, and could not have been, the person who committed the same. Now, if the evidence raises in your mind a reasonable doubt as to the presence of the defendant at the place where the offense was committed at the time of the commission thereof, you will find him not guilty. In this case, the State relies for a conviction upon circumstantial evidence alone; and, in order to warrant a conviction upon such evidence, each fact necessary to establish the guilt of the accused must be proved by competent evidence beyond a reasonable doubt; and the facts and circumstances proved should not only be consistent with the guilt of the accused, but inconsistent with any other reasonable hypothesis or conclusion than that of his guilt, and producing in your minds a reasonable and moral certainty that the accused committed the offense." This charge on circumstantial evidence was excepted to, on the ground that it failed to charge the jury that they must believe that the defendant, "and no other person," committed the offense charged. While the charge in question does not contain said clause, it does contain the clause that the jury must exhaust every reasonable hypothesis or conclusion than that of his guilt before they were authorized to find him guilty. This was in accordance with the rule laid down in Smith v. State, 35 Texas Criminal Reports, 618. However, appellant insists that, under the peculiar facts and circumstances in this case, notwithstanding the court gave a charge on alibi and may have given a correct charge on circumstantial evidence, yet the court should have given the requested

charges. Said requested charges are as follows: "If the jury believe that any other person than the defendant killed the deceased, Mary Jenkins, or if you have a reasonable doubt on this question, you will acquit the defendant, and so say by your verdict." "You are instructed as the law of this case, if it is possible for you to arrive at any other reasonable conclusion or hypothesis from the testimony than that of the guilt of the defendant, you will find the defendant not guilty, and so say by your verdict." Notwithstanding the court gave a correct charge on circumstantial evidence, as before stated, still, under the facts and circumstances of this case, we believe it was incumbent on the court, when requested by defendant, to further instruct the jury on this subject. There was some testimony in the case tending to show suicide on the part of deceased, and appellant strongly insisted on this theory. The charge requested was not predicated directly upon this idea, but it did, by a general allusion, involve this phase of the case; that is, the court was requested to instruct the jury, if they believed the death of the deceased was caused by any other person than the defendant, to acquit him. There is no question that deceased came to her death by violence. While the State introduced testimony tending to show that this violence was caused by defendant, yet the testimony presented the theory of death by suicide, and it was not at all impossible that her death may have been caused by this means. We believe that the attention of the jury should have been directed particularly to this defense, and that a proper charge should have been given them on this subject. It was their duty, under the general charge, no doubt, to exhaust this hypothesis of suicide; nevertheless, under the peculiar facts of this case, in our opinion, their attention should have been specially called to this view of the case.

Appellant also objected to the failure of the court to charge on murder in the second degree. A charge on this subject should have been given. Concede that appellant shot and killed deceased, yet the evidence establishing this is purely circumstantial, and we are not apprised as to how, or under what circumstances, he may have shot her. She may have been lying down when shot, she may have been sitting up, or she may have been standing up. Her husband's pistol was found on her body. Appellant was not shown to have had this pistol in his possession. It may be possible—we do not know—that they may have had an altercation on the ground, and she may have been shot under such circumstances. As was said in Lancaster v. State (Texas Criminal Appeals), 31 Southwestern Reporter, 515: "Where the evidence of the killing is purely circumstantial, no one witnessing the act of killing, how it was brought about, how it occurred, so that the state of mind in which the design to kill is formed and in which it is carried out can not be definitely shown, in all such cases we hold that it is proper for the court to give both degrees of murder in charge to the jury." And also see Blocker v. State, 27 Texas Crim. App., 41; Jones v. State, 29 Texas Crim. App., 338.

Appellant further complains of the following portion of the court's charge on murder in the first degree, in applying the law to the facts of the case, to wit: "You are further instructed, if you believe from the evidence, beyond a reasonable doubt, that the defendant, Bennett, did with a gun, it being a deadly weapon or instrument well calculated to produce death, by the manner in which it was used, with a sedate and deliberate mind and formed design to kill, did unlawfully shoot, and thereby kill, said Mary Jenkins, you will find the defendant guilty of murder in the first degree, and so state in your verdict," etc. Malice aforethought is an essential element in murder in the first degree. While the court had sufficiently defined "malice aforethought" in a previous portion of the charge, and had also given a charge applying the law to the facts, embodying malice aforethought therein, yet we believe that the court should always be careful in presenting charges to the jury to embody therein every essential element of the offense charged. All killing with a sedate and deliberate mind is not murder in the first degree, but there must be a malicious intent formed to kill, in a sedate, deliberate, and cool mind, before it is murder in the first degree.

Appellant also complains in another assignment of the action of the court refusing to wait until Tom Bell, a witness who had been used by the State, and was a very important witness for the State, could be brought in in order to correct the testimony given by him on the preceding day. The bill of exceptions shows that the witness Bell stated before the jury that defendant had told him that he had had intercourse with the deceased time and again; that, after the adjournment of the court on that day, counsel for defendant had a conversation with Bell, in which he stated that he intended to make no such statement; that defendant had not said to him that he had had intercourse with the deceased time and again; that said witness promised to be present the next morning to correct his testimony. When court convened he was absent. Before the argument was begun, defendant's counsel asked that the witness Bell be produced. It was ascertained that he had left town. They then asked that the case be delayed until he could be sent for. This the court refused to grant. Then counsel requested to be put on the stand themselves, to prove the facts stated by them as to what Bell had told them. This the court refused, and required them to proceed with the argument. The court explains this by stating that he did not understand that the witness stated that defendant had told him that he had had intercourse with the deceased, but only stated that he had met her in the brush time and again, but had not seen her that day. The fact as to the intimacy existing between appellant and deceased was an important issue in the case, and the admission of appellant, coming through as substantial a witness as the sheriff of the county, was very material testimony against him. We believe the court should have granted the request to delay the case in order to enable appellant to procure the witness, so that he might correct his testimony, or to ascertain whether or not he would make the correction as stated by counsel. The court excused himself because it was

probable that the witness could not be procured until the next day. The delay of a day in a case of this importance is a small matter to be weighed against the life or liberty of a citizen. For the errors discussed the judgment is reversed and the cause remanded.

*Reversed and remanded.*

HURT, Presiding Judge, absent.