### John Walker v. The State.

#### No. 5099.    Decided October 23, 1918.

**1.—Murder—Evidence—Opinion of Witness.**

Where, upon trial of murder, a State's witness testified that he was an eyewitness to the homicide, and heard what was said and saw what was done between the parties at the time and immediately before the shooting, he should not have been permitted to testify that the reason he did not go back to the house after going away was that he was afraid. Following Dempsey v. State, 27 Texas Crim. App., 269, and other cases.

**2.—Same—Evidence—Dying Declaration—Predicate.**

Where it was not shown by the State that at the time of the making of the declaration of the deceased he was conscious of approaching death; that he believed there was no hope for him to recover; that it was voluntarily made, and not through the persuasion of any other person or in answer to interrogatories; that he was of sane mind at the time, etc., but it appeared from the evidence that the statement was made too remote from the date of the death of the deceased, etc., the declaration should not have been admitted. Following Craven v. State, 49 Texas Crim. Rep., 78, and other cases.

**3.—Same—Evidence—Bill of Exceptions—Motive.**

Where the bill of exceptions did not connect up the matter properly, there was no error in excluding testimony as to the declarations of the defendant to the witness that he should go home, etc., and was too indefinite to show motive as the bill presented it.

**4.—Same—Evidence—Supporting Testimony—Impeaching Witness.**

A general statement of the witness to the effect that the statement of the impeached witness sought to be corroborated was about the same as that testified to on the witness stand, is but a conclusion or an opinion of the witness and does not comply with the rule. Following Richmond v. State, 58 Texas Crim. Rep., 435, and other cases.

**5.—Same—Argument of Counsel—District Attorney.**

Where the district attorney stated in his speech to the jury that he once prosecuted a man in another county in which the facts were very similar to the facts in the instant case, and that the jury in that case assessed the death penalty on that trial, the same was reversible error, as he could not have even testified to such facts. Prendergast, Judge, dissenting.

Appeal from the District Court of Bowie. Tried below before the Hon. H. F. O'Neal.

Appeal from a conviction of murder; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*Mahaffey, Keeney & Dalby,* for appellant.—On question of why witness did not go back to the house: Chambers v. State, 46 Texas Crim. Rep., 61, and other cases.

On question of dying declarations: Craven v. State, 49 Texas Crim. Rep., 78, and cases stated in the opinion.

On question of opinion of witness, as to corroboration: · Taylor v. State, 62 Texas Crim. Rep., 611, and cases cited ·in the opinion.

On question of argument of counsel: Smith v. State, 55 Texas Crim. Rep., 563; McKinley v. State, 52 id., 182; Smith v. State, 44 id., 137.

*E. B. Hendricks,* Assistant Attorney General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder and given ten years in the penitentiary.

The facts show that Kate Edwards, a woman, was living in a house belonging to appellant, or on the same place that he was living. He had control of the house which she was occupying by his consent. The theory of the State was that John Walker was intimate with the woman Kate Edwards, and the killing occurred because the deceased, Will Edwards, was found in the room with Kate Edwards at her house. Appellant came upon them in this room and trouble arose, resulting in the killing of Will Edwards by appellant. The State's theory of the case was that appellant killed him because he was in the room with the woman. It seems to be conceded that appellant came upon him in the room suddenly, not expecting him to be there, and that appellant was passing the house, possibly going to another place and stopped for a moment. The appellant's theory of the case was that when he found the parties in the room together the deceased undertook to kill him, basing the homicide upon self-defense.

Bill of exceptions No. 1 was reserved to the action of the court permitting State's witness Pickens, after testifying that he was present and saw defendant shoot deceased, to testify: "I told Will Edwards that I couldn't do him no good, and that I would go down to the camp and get the other boys and get a doctor for him, and I went on out of the door and jumped over the fence and went on down there. Yes, I went after help and got R. B. Atkins and E. B. Webster, and old man Alf Edwards and Joe Edwards came back up there with us. I was gone a good while—something like an hour—over an hour." Then he was questioned as follows by the district attorney: "It took you something over an hour to go off and get back? A. No, sir; it didn't take that long. After I got there I got scared to go back." To this statement appellant urged many objections. These were overruled, and witness further testified: "Yes, I commenced thinking about going back," and then the district attorney asked him: "You didn't go back there for some little bit on account of being afraid to go back?" Appellant again urged quite a number of objections to this testimony. The witness answered, "Yes, sir." We are of opinion this testimony was

inadmissible. We think it was immaterial, irrelevant and prejudicial. We are of opinion this testimony was inadmissible for several reasons, so plainly so that it is unnecessary to discuss them. See Dempsey v. State, 27 Texas Crim. App., 269; Lyles v. State, 48 Texas Crim. Rep., 119, 86 S. W. Rep., 763; Campbell v. State, 30 Texas Crim. App., 645; Underwood v. State, 39 Texas Crim. Rep., 409; Bennett v. State, 39 Texas Crim. Rep., 639; Chambers v. State, 46 Texas Crim. Rep., 61; Pinckord v. State, 13 Texas Crim. App., 373. This witness testified that he was an eyewitness to the homicide, and heard what was said and saw what was done between the parties at the time and immediately before the shooting. The witness ought not then to have been permitted to testify the reason he did not go back to the house after going away was that he was afraid. He could testify to the facts, but not to the fact that after he left he was afraid to go back where the homicide occurred. This was evidently prejudicial. It was calculated to induce the jury to believe that Pickens thought appellant was a dangerous man and that his, Pickens', life was in danger if he went back.

Bill of exceptions No. 2 was reserved to the action of the court admitting the purported dying declarations of the deceased. The bill is quite lengthy in showing the predicate. It was through the witness Webster that the predicate was laid. He was asked if before the deceased died he made a statement in his presence and in the presence of Mr. Carlow and Mr. Lincoln, who was county attorney of Cass County, and also in the presence of Ben Edwards. This was answered in the affirmative. Witness further stated that deceased thought he was going to die, and he was asked if he wanted to make a statement, and witness answered this in the affirmative. Judge Carlow was present. He was justice of the peace. He reduced the statement to writing; that is, it was done under his direction by the county attorney, Mr. Lincoln. It was read over to and signed by deceased with his mark, and was witnessed by this witness, Judge Carlow, Mr. Lincoln, and Ben Edwards. The statement was then identified by the witness. The attorney representing defendant then took the statement to look over and cross-examine the witness with reference to the predicate. During this cross-examination he was asked if this statement was not made after the deceased went to a sanitarium in Texarkana. He answered in the affirmative. Then he was asked how long the deceased stayed in Texarkana. He did not know definitely, but a day or two; that he understood he went to a sanitarium known as Dale's Sanitarium; that the date on the dying declaration was a correct statement of the time it was made, and that deceased lived about two months after this statement was made; that he lived until December; in fact, it showed he died on Christmas eve, about the 24th of December. He was then asked if deceased's condition was practically the same from the time he made the statement until he died. The answer was: "After he came home we all thought, and he did, that he would get well. That was after he came home from Bowie County where he had gotten shot."

This was the predicate.  Then follows the dying declaration.  A great number of objections were urged to this; first, it was not shown by the State that at the time of the making of the declaration deceased was conscious of approaching death, and that he believed there was no hope for him to recover, and because it was not shown that such declaration was voluntarily made, and because it was not shown that it was not made through the persuasion of any other person, and because it was not shown by the State that such declaration was not made in answer to interrogatories propounded to deceased, calculated to lead deceased to make any particular statement, and because it was not shown by the State that the deceased was of sane mind at the time of the making of the declaration, and because it appeared from the evidence that the statement was made too remote from the date of the death of deceased, and that it appeared from the evidence that the statement was made on the 6th day of November, 1916, and that thereafter the deceased made a trip to Texarkana, which was some thirty-five or forty miles from the home of deceased, and that the deceased lived and did not die until December 24, 1916.  These were all overruled, and the dying declaration read to the jury.  The court qualified this bill as follows: "The above and foregoing bill of exceptions approved and ordered filed with the following qualifications:  The defendant did not object to said testimony on the ground that the deceased was not conscious of approaching death, and that he believed there was no hope for him to recover, and further, there was no objection or exception that the State had not shown by the evidence that the deceased was of sane mind at the time of making of said declaration."  In view of the predicate, we are of opinion the dying declaration was not admissible.  The shooting occurred in the latter part of September.  This dying declaration purports to have been made on the 6th of November.  Deceased died on the 24th of December.  This was practically three months after the shooting.  He died six or seven weeks after the purported dying declaration, and expressed the belief that he would get well.  This is shown by the witness Webster, who proves up the dying declaration.  There was no evidence that deceased believed he was going to die immediately at the time he made the statement, and after making it he expressed the belief that he would get well, and witness says they all believed he would get well.  That he expected to die at some time was not evidence of the fact that he expected immediate approaching death from the shot, especially in view of the other statement in evidence to the effect that he believed he would get well.  It is a certainty that he would die at some time, whether from this wound or other cause, but that fact would not justify the introduction of the dying declaration under the circumstances here detailed.  He must believe at the time he makes the statement that he is going to die and die by reason of the wound inflicted, and that he could not recover from it.  Many authorities are collated in Vernon's Ann. Crim. Proc., under article 808.  See also Craven v. State, 49 Texas Crim. Rep., 78; Ledbetter v. State, 23 Texas Crim.

App., 247; Phillips v. State, 50 Texas Crim. Rep., 127; Fatheree v. State, 34 Texas Crim. Rep., 594. There are a great many other decisions that might be cited, but these are sufficient.

Another bill recites that some time prior to the alleged killing, at a time not fixed by the witness, who was named Samuels, he was at the house of this woman, Kate Edwards, where it is claimed defendant shot deceased, and that on this occasion appellant came to the house and asked the witness to go home and not be lying around there; that he, defendant, acted as if he was mad, and that he had with him an ax. This testimony was objected to on various grounds. We are of opinion as presented by the bill this evidence should have been excluded. Whether this testimony could or could not be introduced properly connected up, is not the question here decided, but as presented by the bill we are of opinion it was not introducible. We suppose that the object of the State in the introduction of this was to show that appellant was jealous of the attentions to this woman by other men, and that that may have had a bearing upon the jury's mind, assisting the State to show that deceased was killed on account of the fact that he was with the woman at the time he was shot, and that jealousy was the prompting reason or motive, but as shown by the bill, we are of opinion that the matter was not properly admitted because it was not definite enough, and was not shown to be in any way connected with this killing or so intimately and closely as to make it admissible. Bill No. 4 is pretty much to the same effect, and by the witness Samuels. He testified, as shown by this bill, that while he and defendant were present at this house, in a conversation defendant told him that the woman was living on his place and that he was going to protect her. If upon another trial this matter is properly connected up, it may be admissible as bearing upon the relations between the defendant and the woman so as to show that this jealousy may have entered into the killing, but as shown by these bills we are of opinion this has not been sufficiently done.

Another bill recites that while the witness Webster was testifying he was permitted to state that on one occasion, four or five days after the alleged shooting of the deceased, Gilbert Pickens made a statement to him in reference to the circumstances of defendant shooting said Will Edwards, and that this statement was similar to the testimony given by the witness Gilbert Pickens during the trial as to the circumstances of the shooting. Appellant objected to this for various and sundry reasons. To be more specific, this bill recites that while the witness Webster was testifying he was asked if he heard the testimony given here by the witness Gilbert Pickens. He answered this in the affirmative. He was then asked: "On the day after this shooting when they brought Will Edwards back to your house, did Gilbert Pickens tell you about how it occurred?" He answered: "I don't believe he came home with him the next day—I don't think Gilbert came home the next day; you see they were hauling heading over there and R. P. brought him home, and the other negroes stayed there a day or two

hauling heading, and I think they came home Friday or Saturday following. Q. Did you ask him how it happened? A. Yes, sir. Q. Was his story the same that he testified? A. Very similar to what he stated on the stand." This is the bill followed by numerous objections, and the court qualifies it by stating: "Was that the testimony was a conclusion and hearsay. Nothing was said about requiring the witness Webster to detail what Pickens told him as to the difficulty. The witness Webster was an honorable white man, and was excused from the rule. He (Webster) heard Pickens testify, and to save time Webster was asked if he told him the same as he testified on the stand. The defendant having impeached Pickens by showing that he made different statements than that testified by him on the stand, I permitted Webster's testimony as bolstering testimony showing Pickens' statement made to Webster in a day or two after the difficulty was the same as testified to by Pickens on the trial of the case." If Pickens was impeached by showing contradictory statements as intimated by the court, then there must have been a proper predicate laid, and the predicate should be followed in the impeachment. Or if he was being sustained, the statements made to the witness must be at least substantially and as near as possible in the language of the witness in both instances, that on the witness stand and that as to his corroborating statement made after the killing. It will not do to hold that a general statement of the witness to the effect that the statement of the impeached witness sought to be corroborated was about the same as that testified on the witness stand. This would be a conclusion of the witness stating his opinion of the statement of Pickens to him. This was a matter for the jury to determine, whether the statements were the same, and that they corroborated. The witness may have thought they were the same. The jury may not have so thought, but in any event the witness could not be corroborated by the testimony of Webster to the effect that in his, Webster's, judgment the stories were practically the same. This is the way in which he was corroborated as shown by the bill and affirmed by the judge in his qualification. We do not believe the witness could be so sustained. See Richmond v. State, 58 Texas Crim. Rep., 435; Spangler v. State, 41 Texas Crim. Rep., 424; Snodgrass v. State, 31 S. W. Rep., 366; Martin v. State, 42 Texas Crim. Rep., 144; Dowell v. State, 58 Texas Crim. Rep., 482; Taylor v. State, 62 Texas Crim. Rep., 611.

There were objections to the speech made by the prosecuting officer which, we think, were well taken. The district attorney stated in his speech that soon after he was elected district attorney he prosecuted a negro in Marion County, in which the facts were very similar to the facts in this case, and that the jury in that case assessed the death penalty against the defendant on that trial. The judge qualifies this by stating: "While the district attorney in his speech was illustrating the law abolishing the first and second degree murder, the above statement was made. I gave the jury a special charge instructing them to

not consider the said remarks of the district attorney for any purpose, and to not let it in any way influence them in arriving at their verdict. The defendant was evidently not injured by said remarks as they did not assess the death penalty." The district attorney committed error. It is unnecessary to discuss this further than to say upon another trial such remarks will not be indulged. It has been decided frequently by this court that where the district attorney desires to testify he should take the witness stand and be sworn and make the statements under oath as any other witness. It would be a conclusive statement to make that he could not testify to facts he stated in his speech, as such testimony will not be permitted to go to the jury. For a collation of the cases bearing upon this question see Branch's Crim. Law, sec. 62.

For the reasons indicated this judgment will be reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, Judge.—I think the bill to the argument of the prosecuting attorney, as explained by the court, shows no error.