## JOHN WALKER v. THE STATE.

### No. 5406.　Decided June 18, 1919.

**1.—Murder—District Court—Transferring Case.**

Where the court was not in existence by law, in such a way as to authorize the transferring of cases to it for adjudication, an order of such transfer was without authority.

**2.—Same—Appeal Pending—Order of District Court—Transfer.**

Where the case was pending on appeal in this court, the court from which the appeal was taken is powerless to enter an order of transfer of the case to another court for adjudication. Following Saufley v. State, 48 Texas Crim. Rep., 563, and other cases.

**3.—Same—Dying Declarations—Conclusion of Witness—Predicate.**

Where the predicate laid to the dying declaration, as well as the manner of taking the statement and writing it down was not in compliance with the law, but was rather a conclusion of the witnesses and the writer of the statement as to what the substance of the declaration was, and some of the statements of the deceased were not dying declarations, the same should not have been introduced in evidence. Following: Cravens v. State, 49 Texas Crim. Rep., 78, and other cases.

**4.—Same—Hearsay Evidence—Dying Declaration.**

Where the dying declarations are intermingled with hearsay statements of witnesses, the same are inadmissible in evidence.

**5.—Same—Dying Declaration—Sufficiency of Predicate.**

Upon trial of murder depending upon dying declaration the court erred in not submitting to the jury the sufficiency of the predicate, in order that they might consider the declaration; there being a doubt about the sufficiency of the predicate laid.

**6.—Same—Manslaughter—Charge of Court.**

Where, upon trial of murder, the evidence suggested manslaughter, all doubts as to the degree of homicide suggested by the evidence must be resolved in favor of the accused, and in the instant case the court should have submitted a charge on the law of manslaughter.

Appeal to the District Court of Bowie. Tried below before the Hon. P. A. Turner.

Appeal from a conviction of murder; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Mahaffey, Keeney & Dalby* for appellant.—On question of jurisdiction of the court: Williams v. State, 171 Alabama, 56; Hinman v. State, 54 Texas Crim. Rep., 434, and cases cited in the opinion.

On question of dying declaration—:Walkes v. State, 206 S. W. Rep., 96, and cases cited in the opinion.

*E. A. Berry,* Assistant Attorney General, of the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was given a term of five years in the penitentiary for murder.

The first appeal will be found reported in 206 S. W. Rep., 96. In a general way the statement as there reported in sufficient for this appèal.

The Fourth Called Session of the Thirty-fifth Legislature created a Criminal District Court for Bowie County. The Act creating this court went into effect on June 26th. On the 20th of said month, six days prior to the taking effect of this Act, there was an order entered in the District Court then having jurisdiction of this case, and where this conviction occurred, transferring it to the criminal district court. The case, at the time of the taking effect of the Act creating the Criminal District Court, and at the time of the transfer of the case to that court, was pending on appeal in this court, and was not disposed of finally on motion for rehearing until December 4th, the original opinion having been rendered on October 30th.

Two questions are suggested under the above statement: First, that the District Court transferring the case was without authority because the Criminal District Court was not in existence in such way as to authorize the transferring of cases to it for adjudication. We are inclined to think this position is well taken. There must be a court in existence to which the cause is transferred in order to authorize the transferring court to make its order of transfer; and it is also necessary that the court to which it is transferred have existence and have authority to assume jurisdiction.

The second proposition is that pending the appeal the court from which the appeal was taken is powerless to enter this character of order; that its jurisdiction would be limited to supplying lost or destroyed records. We find this to be a correct proposition under the statute and decisions construing that statute. See Art. 916, 2 Vernon's Ann. C. C. P., and decisions thereunder collated. See Acts Thirty-fifth Legislature, Fourth Called Session, pp. 48, 51; Saufley v. State, 48 Texas Crim. Rep., 563; Quarels v. State, 37 Texas Crim. Rep., 362; Hinman v. State, 54 Texas Crim. Rep., 434; Estes v. State, 38, Texas Crim. Rep., 506. Under these statutes and decisions the trial court was without authority to transfer this case or make any order in it of the character made to the Criminal District Court of Bowie County.

Another bill of exceptions was reserved to the introduction of the dying declaration of deceased. The shooting occurred in September. On November 6th, thereafter, a dying declaration in writing was signed by deceased. On the 23rd or 24th of the following December he died. This dying declaration on the former appeal was held inadmissible, and the reasons given. There is no material change in the testimony in regard to this matter, except in one respect. It seems on the former appeal it was shown the deceased expressed a hope of

recovery after making the dying declaration. That evidence is wanting on this appeal. This matter is presented in various ways and by several bills of exception. The dying declaration itself is embodied in bill No. 6 and is as follows:

"I, Will Edwards, being of sane mind at the time of making this declaration, and conscious of approaching death, believing there is no hope of my recovery, make the following voluntary statement as my dying declaration concerning the shooting of me by John Walker.

"On or about September 26, 1916, I was at the house of Katie Miller, also known as Katie Edwards, in Bowie County, Texas, Gilbert Perkins was also there with me. I had a conversation with the woman Katie, and then she and I went into a shed room and lay down on the bed. We had been lying there about ten minutes when all at once the door was pushed open and John Walker came in. The door was fastened from the inside and he pushed it open by force. The first words spoken were by John Walker, who said: Katie, get up from there; what are you doing down there' Katie said: 'I aint doing nothing, Mr. Walker, I ain't doing nothing.' I had gotton up and was sitting on the side of the bed. Walker said: 'What in the hell are you doing there then? Katie said: 'Nothing.' Walker then said: 'I'm a good mind to kill you.' Katie began begging him not to do it. At this time and before this, we had both seen Walker's gun, and I heard him cock it. I jumped up and stood up and was pulling my suspenders on when Walker raised his gun at me and shot me in the neck. I fell and Katie began begging him not to shoot again. Walker said to her: 'Hush; God damn you, I will kill you too. She begged him not to do it, and he told her then to get out of there. Walker and Katie then left the room together. He afterwards came back to the house but nothing was said.

"I have known John Walker about three years, and know him well. I have been with him lots, and know him by his voice as well as by sight. On the night I was shot as above stated I recognized John Walker by his voice, and also saw him. A lamp was burning in another room and made light enough in the room we were in for me to see him, and I saw him and knew him. I know it was John Walker that shot me that night, in Bowie County, Texas. At the time I was shot I was not armed; my gun was in another room.

"This is my own voluntary statement, not made through the persuasion of any person, and I am not lead to make any particular statement through the question or suggestions of any person.

Witness my hand this the 6th day of November, A. D. 1916.

His<br>(Signed) Will Edwards.<br>Mark

Witnesses:

        B. B. Webster.
        W. A. Carlow.
        Ben H. Edwards x His Mark.
        Elmer L. Lincoln.''

This bill refers to and makes a part of it the testimony of the attesting witnesses, and especially that of Webster as found on pages 11 to 16 inclusive of the statement of facts, and that of Lincoln found on pages 16 to 19 inclusive. This testimony shows that these witnesses went to where deceased was on the 6th of November. The witness Webster testified that the statement was made before the deceased was carried to the sanitarium, and that before going to the sanitarium it was brought deceased would get well; that he, witness, did not think so after his return. He was at the sanitarium but a short time. In reference to the predicate, he says he talked to deceased and the deceased said he thought that the wound was going to kill him; thought he was going to die, and he wanted to make this statement. He made it in the presence of the witnesses mentioned. These were subscribing witnesses to the dying statment. Witness says he was not led to make any particular statement or answer by any questions asked him that would lead him to make any particular kind of answer. ''I think some questions were asked during the time we were there, both by Mr. Carlow, the justice of the peace, and Mr. Lincoln, the county attorney; they both asked him some questions possibly, in the presence of himself, his father, who was a pretty old and ignorant negro, but no questions to get any particular line of statement out of him. At no time after he made this statement up to the time of his death he never made any statement expressing any hope of recovery. He was taken to Texarkana to have Dr. Dale see him at the sanitarium, but he said he did not think Dr. Dale could cure him.'' The effect of the gun-shot wound which was in the neck was to paralyze deceased in the left side. Witness said he made the statement voluntarily, ''that is, we were all talking about dying and death, about his giving this kind of statement to us; there was nothing else to talk about then much, and just the thing propounded to him and he answered them himself. Q. Did you ask him, or did he say that he thought he would die from this gunshot wound? A. Yes sir, you know that this is a conclusion. You know what I thought about it, because I was with him from the time he came there to the day he died, with the exception of a day or two days that he went to Texarkana—from the time he came there, every day I would see him and his condition.''

Objection was urged to the statement of the witness, and especially that part of it where he uses this language: ''He was not led to make any particular answer by any questions asked him that would lead to any particular kind of answer.'' We are of opinion

this was but a conclusion of the witness. Instead or. expressing his conclusion or belief or summing up occurrences that led to the dying statement, this witness should have stated what did occur. The questions are not stated, nor are the answers to them given. It was but the witness' conclusion and not the facts. Further testifying on cross-examination in regard to this matter this witness said: "I believe about the way it was done, some question would be asked, he would answer, and it was put in the statement in narrative form. Possibly there was some question asked or some statement or answer made by him that does not appear in that statement, but it has been sometime ago and I do not remember just about that. Q. Now Mr. Webster, I will ask you if it is not a fact that this negro, you and a great many people thought for a good while after this negro was shot, that he was going to get well? A. Yes, sir, after they brought him home, I thought possibly so. Q. When he first came home? A. Yes sir. Q. Did not he even think that after he made this statement? A. No sir."

The county attorney, of Cass County, Mr. Lincoln, testified in this connection: "I went up there to take a dying statement from him, and when I went into the room I asked him if he wanted to make a statement about the shooting that caused his trouble, and he said he did, and I questioned him a good little bit about it, and asked him if he believed he was going to die, and he said, yes, that he did not believe he was long for this world, and he wanted to tell the truth about how it happened; and then after some little talk— I could not now recall everything that was said,—but after his statements that he believed that he was going to die, that he did not believe that he was long for this world, and that he wanted to tell the truth about how it happened, I permitted him to make his statement in detail, and he made a long statement of it, and after he had so made his statement, I proceeded to commit the statement to writing—the statements which the deceased made after I had talked to him as I have stated were made by him voluntarily, and were committed to writing by me after they were made; and after I had reduced his statements to writing I then read the entire statement over to him, and the same was signed under his direction, and he made his mark. Now, as to the questions I asked Will Edwards when I first went in the house, and the beginning of taking of the statement; I asked him if he wanted to make a statement, and he said he did; and I asked him if he wanted to tell all about it, and he said that he did; that he did not think he was long for this world, and he wanted to tell the truth about it. This is about all I recall asking him then. No doubt there were other questions or other conversations that took place between him and me leading up to the making of the statement. He then proceeded to make his full statement, and I never questioned him any as to the details of

his statement until after he had finished making his statement; and then I proceeded to commit his statement to writing, and any further questions that were asked him were only to again fix in my mind definitely the statement correctly that he had made in putting it down in writting." On cross-examination he says: "As soon as I told the negro to go ahead and make his statement he went ahead talking, and I suppose he was talking altogether for maybe fifteen minutes telling the whole story. Of course, I did not take his statement down word for word, exactly as he made it and detailed it, but after he had detailed it, then I began writing it down, and in my writing I would along ask him questions about different things pertaining to the statement that he had made, and he would answer these questions, and then I would formulate his answers to that into narrative form and write it into the statement. I would only ask him a question as to what it was he had stated to me in his first statement of it, in order that I would get a connected statement. Of course, you understand that in making such a statement as that they go through a great many details, but I only wanted to get the substance." Then follows the dying declaration heretofore quoted.

It occurs to us this would hardly be considered a dying declaration as given by the declarant. The county attorney would get the deceased's statements and then reduce them to what he called the substance, but a different view might have been taken by the jury if the statement or declaration had been taken as given instead of the conclusion of the writer of that statement as to what the substance was. The predicate as shown by these witnesses, as well as the manner of taking the statement and as written, it occurs to us is hardly in compliance with the law. The whole environment of taking the statement seems to have been more the conclusion of the witnesses as to what the declarant meant than what he actually said; and it will be noticed further that some of the statements included cannot be considered dying declarations. Objections were urged to these also in various bills of exception. To illustrate, one of the bills of exception narrates the following: While Webster was testifying he was asked by the district attorney: "Were the questions asked him (referring to the questions which the witness said were asked the deceased, Will Edwards, shortly and *immediately* before he made the dying declaration above referred to) such as would lead him to make any particular answer?" This question of the district attorney, and the answer of the witness, should have been excluded. This was but a conclusion of the witness' idea as to whether the statements were voluntary. This was a question for the jury and not for the conclusion of the witness. The witness may have thought as he testified, and boubtless he did think so, but the jury were the judges of this matter. This man's liberty was at

stake, and the jury had a right to know and understand just what was said in order to form their conclusion as to whether the statement was voluntary or not. There are quite a number of authorities that might be cited, but see Cravens v. State, 49 Texas Crim. Rep., 81; Ledbetter v. State, 23 Texas Crim. App., 256; Phillips v. State, 50 Texas Crim. Rep., 127; Edmondson v. State, 41 Texas, 500; Irby v. State, 25 Texas Crim. App., 214; Williams v. State, 40 Texas Crim. Rep., 497; Williams v. State, 40 Texas Crim. Rep., 570; Bateson v. State, 46 Texas Crim. Rep., 34; Warren v. State, 9 Texas Crim. App., 629. There are hearsay statements in the declaration which should have been excluded. For instance, he states he and the woman heard the defendant cock his gun. He could not state that she heard it.

Another question is presented to the effect that the court erred in not submitting to the jury the sufficiency of the predicate in order that they might consider the declaration. Where there is a doubt about the sufficiency of the predicate and the condition of the mind of the declarant at the time, it might become a serious question as to whether a party believed he was in danger of death in such manner as required by statute. Where there is a doubt of this question, the jury should be under appropriate instructions authorized to pass upon that question. They might find that it was not voluntarily made within the statute, and also that the declarant's mind was not impressed with that character of impending danger required by the law. Upon another trial if the declaration is admitted under circumstances detailed in this record, the jury should be appropriately instructed in regard to it.

Appellant contends that the issue of manslaughter should have been charged. A sufficient statement of the facts we think is made in the former appeal. If when appellant entered the room where deceased and the woman were it was for the purpose of killing the deceased, the issue of manslaughter might not be raised, but the evidence tends to exclude the idea that he knew of the presence of deceased until he entered the room If the dying declaration be considered, then it showed that appellant entered the room armed with a shot gun and brought on the trouble which ended in the death of the deceased. If the woman's testimony, who was an eyewitness, is to be believed, the deceased was the aggressor and appellant may have shot in self-defense. The issue of self-defense was submitted by the court. There was no light in the room. It was at night. There is testimony showing there was a light in an adjoining room. Appellant's theory of self-defense was predicated upon his statement and that of the woman to the effect that deceased when he arose from the bed drew a pistol and presented it, and appellant shot. Appellant's theory was that he tried to ward off this trouble with deceased who he claims brought it about without explaining what he meant by his language

and conduct and that he began retreating and shot without taking aim. The State's evidence by a witness is that the deceased did not have a pistol with him in that room, but it was in an adjoining room. There is evidence to show, however, that the pistol was in the room where the shooting occurred. We are of opinion that under those circumstances the jury should have been given in charge the law of manslaughter. All doubts as to the degrees of homicide suggested by testimony are resolved in favor of the accused. Upon another trial, therefore, we are of opinion that the issue of manslaughter should be submitted.

For the reasons indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*