JOHN WALKER v. THE STATE.

No. 5759.   Decided March 17, 1920.

Rehearing denied January 26, 1921.

1.—Murder—Certiorari To Perfect Records—Transcript.

Where, upon appeal from a conviction of murder, appellant presented an application for writ of *certiorari* to perfect the record with reference to certain bills of exception, which were not contained in the record, the same is granted with instructions to the clerk of the trial court to send up an additional transcript.

2.—Same—Dying Declaration—Predicate—Practice in District Court—Rule Stated.

When the evidence is conflicting, but sufficient, if believed, to establish the predicate, the practice of submitting the issue to the jury is pursued, and where in the instant case this rule was followed, there was no reversible error on that ground.

3.—Same—Consciousness of Death—Declarations of Deceased.

Where it is found in the records on appeal, on the consciousness of impending death that the declarations of deceased to State's witness was that he was going to die, and to another State's witness that he was not long for this world and that he expressed no hope of recovery, and that his wound was a serious one from the beginning, the same does not fall short in supporting the finding of this fact. Following Miller v. State, 27 Texas Crim. App., 63, and other cases.

4.—Same—Dying Declarations—Time Elapsing Between Statement and Death —Rule Stated.

The length of time elapsing between the making of the statement of the deceased and the date of his death does not conclude the matter nor render the declaration inadmissible, following Hunter v. State, 54 Texas Crim. Rep., 224, and other cases; and the finding by the jury that the declaration was voluntary is supported by the evidence that the deceased was not urged to make the statement and that he made it of his own free will, and there was no reversible error. Following Derden v. State, 56 Texas Crim. Rep., 403, and other cases.

**5.—Same—Dying Declaration—Questions Asked Deceased.**

In the instant case, the conclusion is fully warranted that such questions as were asked the deceased were not calculated to lead him to make any particular statement, and this is the rule established by the statute and by precedent. Following Hunnicutt v. State, 18 Texas Crim. App., 498, and other cases.

**6.—Same—Dying Declarations—Sanity.**

Where, the witnesses declared that the deceased was sane at the time of making the statement, and there is nothing in the evidence which is inconsistent with his statement, there was no reversible error. Following Hunter v. State, 59 Texas Crim. Rep., 439, and other cases.

**7.—Same—Dying Declarations—Rule Limiting Scope Of—Res Gestae.**

The rule limiting the scope of dying declarations to the actual facts which point distinctly to the cause of the death, and to the circumstances producing and attending it cannot be the subject of controversy. Following Hunnicutt v. State, supra; but in the instant case, with the exception perhaps of the statement by the deceased that he had had a conversation with the woman, Katy, the declarations described the occurrences immediately attending the homicide; and, if the statement mentioned is not within this rule, it is so interwoven that it cannot be extricated, and besides, if error was harmless and all the rest was *res gestae*.

**8.—Same—Evidence—Dying Declarations—Predicate—Former Appeal.**

Where, on a former appeal this court ruled that the evidence relating to the predicate was such as rendered it appropriate that its sufficiency be passed upon by the jury, and this course was adopted upon the instant trial, the verdict of the jury will not be disturbed. Following Walker v. State, 214 S. W. Rep., 332.

**9.—Same—Bills of Exception—Bystander's Bill—Attorney and Client.**

Where, upon trial of murder there was a controversy between the defendant and the court touching one of the bills of exception, and in lieu of which the defendant sought to file a bystander's bill, and the same was signed by himself and his counsel, held, that the statutes, Article 2067, Revised Civil Statutes, in using the term "bystanders" does not include parties to the suit or their attorneys. Following White v. State, 23 Texas Crim. App., 154, and other cases; besides, the bill of exceptions did not present any error.

**10.—Same—Manslaughter—Charge of Court—Former Appeal.**

Where, in a former appeal of the instant case, this court held that the issue of manslaughter was raised, and the trial court's charge in the instant case was sufficient to present it, especially in view of the absence of requested instructions, there was no reversible error. Following Young v. State, 54 Texas Crim. Rep., 422, and other cases.

**11.—Same—Self-defense—Apparent Danger—Actual Danger—Charge of Court.**

Where, under the facts of the instant case, it would have been a delicate and difficult task for the trial court to have framed an affirmative charge specifically pointing to the facts raising the issue of apparent danger as contradistinguished from actual danger, without discrediting the theory of the defendant presented by his testimony, and rendering his charge subject to the criticism that it dwelled upon an issue not raised by the evidence, the court's charge on self-defense was not open to the criticism made. Following Simmons v. State, 55 Texas Crim. Rep., 448, and other cases.

**12.—Same—Reasonable Doubt—Charge of Court—Rule Stated.**

Where, a correct instruction on the law of reasonable doubt was embraced in the court's charge, the same was sufficient, and it was not essential that the doctrine of reasonable doubt be appended to each paragraph of the charge. Following Edwards v. State, 58 Texas Crim. Rep., 42, and other cases.

**13.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder and a conviction of that offense, the evidence was sufficient to sustain the conviction, under a proper charge of the court, there was no reversible error.

**14.—Same—Rehearing—Dying Declarations—Predicate.**

Where, the question of sufficient predicate for the admission of dying declarations was submitted to the jury, and they were told to disregard certain declarations if the predicate was not laid, this was correct practice. Following Walker v. State, 85 Texas Crim. Rep., 483.

**15.—Same—Motive—Dying Declarations.**

Where, the only motive for the killing relied on by the State was defendant's anger because of the intimacy between the deceased and the woman, Katy, that part of the alleged dying declaration which states that deceased and said woman went into a room, etc., which the defendant entered and killed the deceased, there was no reversible error.

**16.—Same—Evidence—Res Gestæ.**

That part of the dying declaration that the woman, Katy, begged the defendant not to shoot deceased again, after he had fired the fatal shot, that defendant with an oath told her to hush or he would kill her too, was part of the *res gestae*. Following Jeffries v. State, 9 Texas Crim. App., 603, and other cases.

**17.—Same—Dying Declaration—Manslaughter—Charge of Court.**

That part of the dying declaration, that deceased thought he would die as a result of the gun-shot wound, was admissible as being his opinion upon the matter of his approaching dissolution, and there was no reversible error; and the court's charge on manslaughter, etc., being correct, there was no reversible error.

Appeal from the District Court of Bowie. Tried below before the Honorable P. A. Turner.

Appeal from a conviction of murder; penalty, fifteen years imprisonment in the penitentiary.

The opinion states the case.

*Mahaffey, Keeny & Dalby,* for appellant.—Cited cases in opinion.

*Alvin M. Owsley,* Assistant Attorney General, for the State.—Cited cases in the opinion.

DAVIDSON, PRESIDING JUDGE.—Appellant presents an application for writ of *certiorari* to perfect the record. The basis of this is found in the following statement: Appellant presented to the court a bill of exceptions for his approval. The court took the bill, and, after keep-

ing it for a while, qualified and filed it without notice to or consent of appellant. When this was done appellant filed an exception to the action of the court, accompanied also by a by-standers' bill showing the facts. The merits of the question are not here discussed, but believing that the matter should have been sent up in the record so this court could fully understand the situation and how the bill was filed, and connecting circumstances, the application for *certiorari* will be granted, and the clerk of the trial court ordered to send up an additional transcript showing these bills of exception and the true *status* of the case. There may be questions for discussion when the matter is before the court, first, whether this court under all the circumstances will consider the bill as filed by the judge with his qualification under the circumstances stated; second, whether this court will consider the by-standers' bill in connection with appellant's exception to the action of the court in qualifying his bill without his knowledge or consent, and filing it in the record. The application for *certiorari,* therefore, will be awarded and the clerk of the trial court directed to send up an additional transcript showing these matters.

*Order for additional transcript.*

opinion, May, 1920.

MORROW, Judge.—The appeal is from a judgment condemning appellant to confinement in the penitentiary for a period of fifteen years for the offense of murder.

On the 26th day of September, 1916, the appellant, while in the room with the deceased, fired one shot, using a shotgun loaded with squirrel shot, which took effect in the neck of deceased, resulting in partial paralysis, and from this wound death resulted on December 23, 1916. The dying declaration of deceased, made November 6, 1916, was introduced in evidence. The sufficiency of the predicate is attacked, and the bill refers to the testimony of the witnesses Lincoln and Webster in the statement of facts. E. L. Lincoln, attorney who took the dying declaration, testified that he didn't know Will Edwards, deceased, personally during his lifetime, but that he got acquainted with him. Witness was County Attorney of Cass County at the time, and testified that he went out to Mr. Webster's place upon request to take the statement; that when he got there he asked deceased "if he wanted to make a statement about how the shooting occurred," and "he told me he wanted to tell me about it, that he thought he wasn't long for this world, and he wanted to tell the truth about how it happened; he was paralyzed then. From the conversation I had with him, he was sane." Witness said he told deceased to go ahead and tell the story in his own words; the deceased did so; and that while he was relating the incidence, witness might have asked him a few questions such as the names of certain parties concerned, but that on the whole the occurrence was told without interruption or prompting; that when deceased

had related the entire affair, he—witness—then put it down in writing, and deceased signed it, after it was read over to him; that the language in the statement was written as deceased's own, but that the verbiage might be the witness's though the quotations were in the identical language of the deceased. This witness said further: "The negro did not make that statement at my request; I was requested to go out and take the statement; no one requested the negro to make the statement in my presence, and nobody urged him to make the statement, or a statement of any kind while I was there. So far as I know, it was voluntarily made by him." With regard to questions asked deceased during composition of the declaration, the witness didn't recall specifically asking any questions, but said he probably questioned him a little as to the names of parties, or as to what happened at such and such a place, as he was not familiar with the occurrence and this was the first time he had heard it.

The witness B. B. Webster testified that he knew the deceased, and had known him practically all his life; that deceased stayed on witness's premises in an out-house practically the entire time from the date of the shooting until his death. Witness said: "I remember the occasion of his making a statement which was written down by Mr. Lincoln. Before he made this statement he said he thought he would die as a result of that gunshot wound;" that witness told the justice of the peace that deceased wanted to make a statement, and the justice got Mr. Lincoln and went out to him; that just before making the statement, and at no time after did deceased express any hope of recovery. Deceased had made a trip to Texarkana at one time after the shooting, but he didn't think he would get well then, nor at any time after making the declaration. Witness didn't know just how deceased happened to make the statement, and said: "He told me he knew he was going to die, and he wanted John punished for killing him; possibly I told him, I don't know. There was possibly other things that led up to it; he might have been influenced by what I said to him, but he was not urged to make the statement by anybody; he was not influenced to tell how it happened at all; he told that of his own free will.

Requisites of the predicate for the introduction of the dying declaration in this State are prescribed by statute: "1. That at the time of making such declaration he was conscious of approaching death, and believed there was no hope of recovery. 2. That such declaration was voluntarily made, and not through the persuasion of any person. 3. That such declaration was not made in answer to interrogatories calculated to lead the deceased to make any particular statement. 4. That he was of sane mind at the time of making the declaration." Article 808, C. C. P.

When the evidence is conflicting, but sufficient if believed to establish the predicate, the practice of submitting the issue to the jury is pursued. Taylor v. State, 38 Texas Crim. Rep., 567; Hunter v. State,

59 Texas Crim. Rep., 454; Ward v. State, 70 Texas Crim. Rep., 393, 159 S. W. Rep., 277; Martinez v. State, 56 S. W. Rep., 58; Hopkins v. State, 53 S. W. Rep., 621. This was done in the instant case, and if there was evidence sufficient to support it, the verdict of the jury is binding upon this court.

On the consciousness of impending death, we find the direct declaration of the deceased to the witness Webster that he was going to die, and to Lincoln that he didn't think he was long for this world, also that he expressed no hope of recovery. His wound was a serious one from the beginning, and we fail to comprehend in what sense the testimony falls short in supporting the finding of this fact. See Miller v. State, 27 Texas Crim. App., 63, from which we quote: "To infer under the facts attending deceased when the statement was made that he simply meant that at some time he was bound to die would be unnatural and unreasonable. The declarations must be made under a sense of impending death, but it is not necessary that they should be stated at the time to be so made. It is enough if it satisfactorily appears in any manner that they were made under that sanction; whether it be directly proved by the express language of the declaration or be inferred from his evident danger, or from his conduct or other circumstances of the case, all of which are resorted to to ascertain the state of the declarant's mind." Thomas v. State, 49 Texas Crim. Rep., 642; Sims v. State, 36 Texas Crim. Rep., 154.

The length of time elapsing between the making of the statement and the date of the death did not conclude the matter, nor render the declaration inadmissible. Hunter v. State, 54 Texas Crim. Rep., 224; Fulcher v. State, 28 Texas Crim. App., 471; Crockett v. State, 45 Texas Crim. Rep., 280; Wharton's Crim. Evidence, sec. 286; Ruling Case Law, vol. 1, p. 539.

The finding that the declaration was voluntary and not made through persuasion is supported by the direct testimony of the witness that the deceased was not urged to make the statement, that he made it of his own free-will. This testimony indicates that the deceased made the statement by design, that it was an act proceeding from his own free-will, and not brought about by external influences. The jury having accepted the proof as sufficient to show that the statement was voluntary, and not the result of persuasion, we are not warranted in deciding the contrary. The term voluntary has been defined by the decisions of this court. Derden v. State, 56 Texas Crim. Rep., 403; Thompson v. State, 24 Texas Crim. App., 383.

The evidence, we think fully warrants the conclusion that such questions as were asked were not calculated to lead the deceased to make any particular statement. The witness taking the statement declared that he recalled asking no particular question, that he was unacquainted with the parties and unfamiliar with their names, and that he made inquiries as to them as he proceeded with the writing to assure himself of the correctness, and said: "I did not ask him any other questions

except the character I have named. The language in this statement is written as his own, but, of course, the verbiage of it, you might say, is mine, *but the quotations are his identical words."* Questions are not prohibited, and do not destroy the declaration unless the character of the questions is such as to lead the deceased to make the particular statement. This is the rule established by statute and precedent. Hunnicut v. State, 18 Texas Crim. App., 498; Beckham v. State, 76 Texas Crim. Rep., 520, 176 S. W. Rep., 564; Ward v. State, 70 Texas Crim. Rep., 393; Taylor v. State, 38 Texas Crim. Rep., 552; Testard v. State, 26 Texas Crim. App., 260; White v. State, 30 Texas Crim. App., 652.

The witnesses declared that the deceased was sane, and we fail to find in the evidence that which is inconsistent with his sanity at the time the statement was made. Taylor v. State, 38 Texas Crim. Rep., 552; Poke v. State, 35 Texas Crim. Rep., 495; Hunter v. State, 59 Texas Crim Rep., 439.

We set out the dying declaration as follows:
"The State of Texas,
County of Cass.

I, Will Edwards, being of sound mind at the time of making this declaration, and conscious of approaching death, believing that there is no hope of my recovery, make the following voluntary statement as my dying declaration concerning the shooting of me by John Walker.

On or about Sept. 26th, 1916, I was at the house of Katie Miller, also known as Katie Edwards, in Bowie County, Texas. Gilbert Pickens was also there with me. *I had a conversation with the woman Katie, and then she and I went into the shed room and lay down on the bed, and we had been lying there about ten minutes* when all at once the door was pushed open and John Walker came in. The door was fastened from the inside and he pushed it open by force. *The first words spoken were by John Walker, who said, "Katie, get up from there, what are you doing down there?"* Katie said, "I ain't doing nothing, Mr. Walker, I ain't doing nothing." I had gotten up and was sitting on the side of the bed. Walker said, *"What the hell are you doing down there then?"* Katie said, *"Nothing." Walker then said, "I'm a good mind to kill you;" Katie began begging him not to do it.* I jumped up and stood up and was pulling my suspenders on when Walker raised his gun at me and shot me in the neck. I fell, and Katie began begging him not to shoot again. *Walker said to her, "Hush, God damn you, I will kill you too."* She begged him not to do it, and he told her then to get out of there. Walker and Katie left the room together. He afterwards came back to the house, but nothing was said.

I have known John Walker about three years, and know him well. I have been with him lots, and knew him by his voice as well as by sight. On the night I was shot, as above stated, I recognized John Walker by his voice, and also saw him. A lamp was burning in an-

other room, and made light enough in the room we were in for me to see him, and I saw him and knew him. I know it was John Walker that shot me that night in Bowie County, Texas. At the time I was shot I was not armed; my gun was in another room.

This is my own voluntary statement, not made through the persuasion of any person, and I am not led to make any particular statement through the questions or suggestions of any person.

Witness my hand this the 6th day of Nov. A. D. 1916.

his

Signed     Will X. Edwards.

mark

Witnesses:
   B. B. Webster—W. A. Carlow—Ben Edwards—Elmer L. Lincoln."

Additional objection was made to the specific parts which are italicized. The rule limiting the scope of dying declarations to the actual facts which point distinctly to the cause of the death, and to the circumstances producing and attending it, cannot be the subject of controversy. Wharton's Crim. Evidence, sec. 109; note in Worthington v. State, 56 L. R. A., 369; State v. Meyer, 86 Amer. St. Rep., 647, and note; Hunnicut v. State, 18 Texas Crim. App., 498. In the application of this rule we find in the dying declaration in Medina v. State, 43 Texas Crim. Rep., 53, the deceased, after describing the immediate incidents of the homicide, said: "The parties got on their horses, and and left some meat on their wagon, and pulled out," that they left him there, and he crawled through the bosquet, and got lost, and when daylight came he was in the same place that he started from; that there were some wire fences and brickyards there. This evidence was held admissible as tending to prove the venue. In West v. State, 7 Texas Crim. App., 156, it was stated in the declaration that appellant came to the store and talked with the deceased for half an hour. As he was going to dinner, he called deceased around the house and charged him with insulting his mother, which he denied. The witness said: "In this interview he told me he had not insulted his mother." The court held this statement not so violative of the rule as to require a reversal, and further held that the objectionable portion was so intimately interwoven with the thread of the narrative that it could not be separated without marring, if not destroying, the sense.

We are referred to Williams v. State, 40 Texas Crim. Rep., 565, in which the part of the declaration excluded "I did not write the article which gave offense" related to a past event. In Manley v. State, 62 Texas Crim. Rep., 395, to which we are also referred, the objectionable testimony related to the expression of an opinion by the declarant. In both of these cases the well-established rule touching the admission of dying declarations is applied. Underhill on Crim. Evidence, sec. 108. We are unable to classify the part of the dying declaration herein complained of as within these rules. With the exception, perhaps, of the

statement by the deceased that he had had a conversation with the woman Katie, the declaration described the occurrences immediately attending the homicide; and if the statement mentioned is not within this rule, it is so interwoven that it cannot be extricated, and, moreover, considered in connection with the part of the statement which is subject to no valid objection, the clause, "I had a conversation with the woman Katie" could not, in our opinion, have been harmful. It is our opinion in fact that it was not subject to objection. From other parts of the statement it appears that at the time of the shooting appellant and deceased were in the room occupied by the woman Katie, and that immediately before he was shot, the appellant was in bed with her. This was clearly *res gestae*. Certainly the words spoken by the appellant, his remarks to the woman, were a part of the transaction; they tended to show his intent, and their reception in evidence is at variance with no phase of the law relating to dying declarations to which our attention has been directed, or of which we are conscious. A part of the dying declaration, which was held inadmissible upon a former trial as stating a conclusion, was omitted at the present trial, and the same is true touching portions of the predicate. See Walker v. State, 85 Texas Crim. Rep., 482, 214 S. W. Rep., 332. On the last appeal the appellant made, and the court sustained, the point that the evidence relating to the predicate was such as rendered it appropriate that its sufficiency be passed upon by the jury. This course was adopted upon the present trial, and, as indicated above, we do not feel warranted in view of the evidence in overturning the verdict favorable to the State upon the sufficiency of the predicate for the dying declaration.

The record discloses a controversy touching one of the bills of exception. As found in the record, it bears a qualification by the trial judge, in lieu of which appellant sought to file a Bystanders' Bill. Of the persons signing the Bystanders' Bill, one was the attorney for the appellant and the other the appellant himself. The statute, Article 2067, Revised Civil Statutes, in using the term "Bystanders" we think does not include parties to the suit or their attorneys. Construing a statute similar to ours, the Supreme Court of Missouri, refusing to consider a bill in which one of those verifying it as a bystander was an attorney in the case, said: "The object of the statute in requiring refused bill to be signed by three bystanders, respectable inhabitants, etc., was doubtless to obtain to such a bill the signature of disinterested spectators, and not those whose interests are at war with such an attitude of indifference." State v. Jones, 14 S. W. Rep., 947; White v. State, 23 Texas Crim, App., 154.

The definition of the term "bystander," "one who stands near; one who is not concerned with the business transacted," Webster's Dictionary, is exclusive of the attorney and party to suit. Unable to consider the bystanders' bill because of its non-compliance with the statute, and turning to the bill as qualified by the court, it is clear that it presents no error, and we think that if the bill were considered without the

qualification the same result would follow. The matter arose while laying the predicate for the introduction of the dying declaration. The witness Webster was asked: "Did he, deceased, say anything that would indicate whether or not he thought he was going to die as a result of that gunshot wound before he made this statement?" Answer; "Yes sir, he did." Question: "What did he say about it?" Answer: "I don't know just the words, but he meant—" Attorney for defendant: "I object to 'what he meant.'" State's attorney: "Tell the substance." Answer: "Well, he thought he would die." Question: "As a result of that gunshot wound?" Answer: "Yes." The objection urged is that the witness gave his conclusion instead of a fact. Taken in connection with the questions and answers quoted, the answer "Well, he thought he would die" does not impress us as the opinion of the witness, but indicates his reply to the request to tell the substance of what the deceased said. In objecting to the dying declaration, the appellant in his bill of exception No. 1 refers in the statement of facts to the entire testimony of the witness Webster, and we find it there quoted: "Before he made this statement he said he thought he would die as a result of that gunshot wound." As the matter is presented here, however, the only bill of exceptions before us on the subject is that bearing the qualification of the trial judge. Hardy v. State, 31 Texas Crim. Rep., 289; Roe v. State, 55 Texas Crim. Rep., 132; Branch's Annotated Texas Penal Code, sec. 215, and cases cited.

Exceptions were reserved to the form of the charge on manslaughter. No special charges were requested. This is the third appeal, the first is reported in the 206 S. W. Rep., 96, and the second in 85 Texas Crim. Rep., 482, 214 S. W. Rep., 332. In the second appeal, the court, stating the theories of both the State and the appellant, held that the issue of manslaughter was raised. In the instant case, the issue of manslaughter was submitted in the usual language, accompanied by a paragraph containing the following: "If you believe from the evidence that the defendant entered the room where the deceased was shot, and that when he entered it the presence of the deceased and the words, if any, of the deceased, and the acts, if any, of the deceased, and from all the evidence in the case there was created in the mind of the defendant anger, rage, sudden resentment or terror that rendered it incapable of cool reflection, and that such facts would have commonly produced a degree of anger, rage, sudden resentment or terror in the mind of a person of ordinary temper sufficient to render it incapable of cool reflection, then this may be adequate cause." We are of the opinion that the issue of manslaughter, as raised by the evidence, was sufficiently presented, especially in view of the absence of requested instructions. Young v. State, 54 Texas Crim. Rep., 422; Sargent v. State, 35 Texas Crim. Rep., 338; Branch's Crim. Law of Texas, sec. 512; Branch's Annotated Texas Penal Code, sec. 2049.

Appellant's theory of the case, as adduced from his testimony, was that he and Katie lived about one hundred fifty yards apart; that they

were working a crop together; that on the night of the homicide he went to her house on business without knowledge of the presence of the deceased; that he took his gun in view of the possibility of seeing a possum that he might shoot; that on knocking on the door, the woman invited him to come in, and on entering the deceased jumped up off the bed, and with an oath and epithet ordered him out; that appellant told him to "hold on," and the deceased renewed his demand, at the same time as appellant said, "I seen that he throwed a pistol down on me, and when I seen that I just looked to fall back the other way. I just said to myself 'I'm going to shoot falling. He had it down on me like that, and I just whirled and shot. When I fired that shot I thought that nigger was going to shoot me with that pistol." The woman Kate, who afterwards became the wife of the appellant, testified that the deceased was lying down on the bed and she was sitting in the room, when the appellant knocked, and was by her invited to enter. The deceased jumped up and ordered the appellant to leave. Appellant said: "Hold on there, wait, tell me what is the matter," and deceased said; "God damn you, get out of here." Appellant said: "Give me time, friend, hold on, tell me what is the matter;" and about that time the deceased jerked a gun out of his pocket, and threw out the gun in his hand, when the appellant fired. Applying the law of self-defense to the facts, the court used the following language:

"A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant.

If from the evidence you believe the defendant killed the said Will Edwards but further believe that at the time of so doing the deceased had made an attack or threatened attack on him which, from the manner and character of it and from all the evidence in this case and the defendant's knowledge of the character and disposition of the deceased, caused him to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear, the defendant killed the deceased, then you should acquit him; and if the deceased was armed at the time he was killed and was making such attack on defendant, and if the weapon used by him and the manner of its use were such as were reasonably calculated to produce death or serious bodily harm, then the law presumes the deceased intended to murder or aimed to inflict serious bodily injury upon the defendant."

Under the facts, we think the charge is not open to the criticism made, particularly in the absence of a requested charge formulating more specific instructions. As said by Judge HURT: "A charge is correct or incorrect as it applies or fails to apply the law to the case made

by the evidence. In very many cases the danger may not in fact be real, and yet appear so to the defendant. When this is so, the rule urged by appellant's counsel becomes of the highest importance, and should be given in charge to the jury. In other cases the danger is evident, patent, and in these the rule has no application."

In the case before us the evidence of self-defense went to show that the deceased at the time he was shot, with pistol presented, was in the act of shooting appellant, who stood within twelve feet of him, and that he was prevented from shooting alone by the prompt discharge of appellant's gun. Under these facts, it would have been a delicate and difficult task for the trial court to frame an affirmative charge specifically pointing to facts raising the issue of apparent danger as contradistinguished from actual danger without discrediting the theory of the appellant presented by his testimony, and rendering his charge subject to the criticism that it dwelt upon an issue not raised by the evidence. In many instances facts similar to those disclosed by the present record have been held to raise the issue of actual danger alone. Note Simmons v. State, 55 Texas Crim. Rep., 448; Payton v. State, 60 Texas Crim. Rep., 381, and cases collated in Branch's Annotated Texas Penal Code, sec. 1927. The charge apparently presented for solution the real question at issue. Snowberger v. State, 58 Texas Crim. Rep., 553.

A correct instruction on the law of reasonable doubt was embraced in the court's charge. In the absence of some special reason therefor, it was not essential that the doctrine of reasonable doubt be appended to each paragraph of the charge. Edwards v. State, 58 Texas Crim. Rep., 342; and other cases listed in Vernon's Texas Crim. Statutes, vol. 2, p. 684, note 19.

Upon a careful review of the record, we are convinced that the conviction is upon sufficient evidence, and that no errors were committed which would justify a reversal. An affirmance must result.

*Affirmed.*

ON REHEARING,

January 26, 1921.

LATTIMORE, Judge.—It is again urged in motion for rehearing that the statement of Will Edwards admitted as a dying declaration was not competent. The matter is discussed at length in our former opinion, and we think correctly decided. If there was any doubt from the record as to the establishment of the required predicate for the admission of such statement, the jury were fully told in the charge to disregard such declaration and this has been held to be the proper practice.

In both our former opinions in this case, 206 S. W. R., and 85 Texas Crim. Rep., 482, 214 S. W. R., 331, attention was called to

objectionable matters in the predicate and also the statement of the deceased and the present trial seems to indicate an effort to conform to our views so expressed.

We think that part of the alleged dying declaration which states that after a conversation with the woman Katie she and deceased went into a room and laid down on the bed was directly pertinent. The only motive for the killing relied on by the State was anger because of the intimacy between deceased and the woman Katie and this statement makes clear the situation of the parties when appellant came upon them, and rejects the reason relied upon as causing him to kill deceased.

That the woman Katie begged the appellant not to shoot again after he had fired the fatal shot; and that appellant with an oath told her to hush or he would kill her too, was a part of the *res gestae*, and admissible. Appellant's statement to the woman affected his mental attitude and her statement to him was a necessary predicate to understand why he used to her the language so attributed to him. Jeffries v. State, 9 Texas App., 603; Jennings v. State, 42 Texas Crim. Rep., 81.

Witness Webster testified that before deceased made the alleged dying declaration he said he thought he would die as a result of that gun-shot wound. In another part of the testimony of said witness he said deceased got worse before making said dying declaration and told witness he knew he was going to die. We think both statements of deceased were admissible as being his opinion upon the matter of his approaching dissolution. If a man believes he is going to die and under such belief make a statement in the nature of a dying declaration, the impulse to truth, and the restraint from falsehood resulting from such belief is received as a substitute for the oath ordinarily necessary. We know of no authority holding inadmissible the expression of deceased of his belief that he will die from the injury.

We think the charge of the trial court on manslaughter fair and just, that it gave to appellant the right of consideration by the jury of all that occurred in determining his state of mind when he shot. We find no error in the former opinion of this court and the motion for rehearing will be overruled.

*Overruled.*