# NOVEMBER 13, 1935

OHLEN CRANFILL V. THE STATE.

No. 17741.  Delivered November 13, 1935.

The opinion states the case:

*Otto Atchley,* of New Boston, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

HAWKINS, JUDGE.—Appellant was convicted for murder without malice aforethought and his punishment assessed at three years in the penitentiary. The name of deceased was Will Sisk.

One contention made by appellant is that he should have been granted a new trial on the ground of newly discovered evidence. In order to discuss the matter understandingly we set out the facts with more particularity than is usually thought necessary. Appellant's mother owned a large farm which was worked partly by tenants, and partly by hired labor. Appellant was overseer for his mother, directing and supervising the hired labor, but having nothing to do with supervising that part of the farm worked by tenants. In September, 1934, appellant and his mother had concluded to work most of the farm by hired labor during 1935, and appellant claimed that his mother had directed him to follow the corn gathering and cut the corn stalks to get the land in condition for early cultivation. Will Sisk (deceased) was one of the tenants for 1934. Previous to the killing appellant and Sisk had some conversation about cutting the stalks on the corn land which had been farmed by the latter. Deceased's wife testified that on the morning of the killing appellant came to their house and she heard appellant say to her husband, "Bill, do you have any objection to us cutting your cornstalks?" to which Sisk replied, "I had rather you would let them alone. If I stay here I want to cut them myself." Appellant testified that in a conversation with Sisk a day or two before the killing appellant told him that he (appellant) was ready to cut Sisk's stalks, and that Sisk said, "Well, I don't want to pay for any labor on it in case I work the land another year," and that no further conversation occurred between them about it until the time of the homicide. On the 19th of September, appellant had a negro cutting stalks and after finishing some other fields sent him into Sisk's field to cut the stalks there. Sisk, at the time, was at a small store playing dominoes. Appellant was also at the store. When he left Sisk asked where he was going and appellant told him that he was going to the field. A short time after appellant left some one came into the store and told Sisk they were cutting his stalks, to which he replied, "Surely not,

I believe I will get in my car and go see." The evidence shows that he drove rapidly toward the field, about five or ten minutes behind appellant; that on the way he hit a truck which was stalled in the road, damaging the fender and running board on his car; that he did not stop, but continued on to the field. Appellant had stopped his car at the ends of the corn rows and was watching the negro who was running the stalk cutter. Witnesses who saw Sisk approaching said he drove up rapidly and stopped his car near appellant's car and got out. No witness was near enough to hear what was said between the parties. The State introduced the dying declaration of Sisk which was in substance that he drove up and said to appellant, "Son, I thought I asked you not to cut these stalks;" appellant said, "What are you going to do about it?" Sisk said, "Nothing." Appellant then said, "You are a G— d— l—," and pulled out his gun; that Sisk said, "You don't have to do this," and that appellant then shot him; that he called for the negro who was cutting the stalks to come help him, and that appellant said to the negro, "You keep on cutting those stalks and let the s— of a b— lie here and die." Appellant's version of the transaction is as follows: "When he stopped there I turned around and looked at him. He asked what in the God damn hell I was doing cutting his stalks, and at the same time he opened his door and got out. I noticed the expression on his face,—he looked mad or wild or angry or something. He got out of his car and came between the cars to the back of my car and up to the side of my car. After he got out of his car and made such a rushing start I got out of my car. He come on from behind my car, and about the time he got from behind it, I had stepped out and I saw the disposition he was in. He come on saying, 'I will learn you how to cut them,' and I don't know what else he said. He was rushing so and seemed to be so mad, I don't know what he said. I was scared. As he came around the car to where I could see him, I started stepping backwards pretty pert and asked him to stop, stop. I told him to stop several times, and as he got a few steps from behind the car, he made an attempt to his pocket, and I fired a shot to bluff him, and he kept coming on, and I fired the last shot to hit him, because I believed he was going to kill me. From his acts I knew he intended to cut me to pieces, and that was why I shot him. I would not have shot him if I had not had to. When I shot him, he fell slightly forward, and after that I think he raised back. At that time Alex Lott was somewhere up in the field close to the end where this happened. I told

him to stop and go to the house and tell what had happened, and for somebody to come down there."

On cross-examination appellant said he saw no knife or pistol in deceased's hand. We gather from the statement of facts that he was asked whether Sisk made any threat to kill him. Appellant testified that he did not recall the words deceased used further than those already set out above, but said: "I could not say I remember the exact words of the threat, but he was threatening to do something, both by words of mouth and acts." The State proved that deceased had no weapon in his pocket with the exception of a small toy knife about two inches long which belonged to one of his children. A negro by the name of Wyatt who was picking cotton about two hundred yards from the point of the shooting was the first witness to reach deceased. He got to him in about five minutes after the shooting. Appellant had already gotten in his car and left. It was developed from this witness on cross-examination that when he reached Sisk the latter was lying on the ground resting on his elbow. He was not trying to raise up at the time witness got to him, but witness had seen him "scuffling" before he got there. This witness testified that the very first statement Sisk made to witness was that he told witness to look on the ground and in the car to see if he could see a gun or knife or anything; that witness looked, but found nothing either on the ground or in the car; that further than as indicated Sisk made no statement to witness at that time.

The claimed newly discovered evidence comes from the witness Wall. It appears from the record that at the time of the killing it had not rained for quite a while; that the ground was dry and there were cracks in the alfalfa field and that the alfalfa was from four to six inches high. It further appears that before the trial appellant's attorney went to the place of the killing to look over the ground where the killing occurred to familiarize himself with physical details of the place. The spot where the killing occurred was pointed out to the attorney by appellant. It had been raining previous to this trip and the ground was then wet. They went to the point in a wagon which was turned around in the edge of the alfalfa field. The affidavit of the witness Wall was attached to the motion for new trial and he also testified upon the hearing of the motion for new trial. Wall was a tenant upon the farm of appellant's father. He testified that on the day after the jury brought in the verdict in this case he was passing down the turn-row between the alfalfa field and Mr. Sisk's corn field; that he was

not looking for anything in the way of a weapon, but was hunting cattle; that in the edge of the alfalfa field, and at a place where it looked like it had been buried by a wagon wheel turning around, he found a knife; that it was partly under the ground where the wagon had turned; that witness got off of his horse and picked up the knife and found caked dirt in the handle and on the blade and that the blade was still buried in the ground at the time he found it; that he carried the knife immediately to appellant's attorney. Upon cross-examination witness admitted that he was a good friend of appellant and of appellant's father; that he was interested in the defense of the suit, and thought the testimony was valuable to appellant was the reason he immediately took the knife to the office of appellant's attorney. The witness further testified that he did not know the exact point at which the killing occurred, but realizing, as he thought, the importance of the knife, he marked upon the ground the place where he had found it, and later went with appellant and pointed out to him exactly where he had found the knife. Appellant on motion for new trial testified that the place pointed out to him by the witness Wall was within a foot or two of the point where Mr. Sisk fell after he was shot. Other witnesses testified upon the motion for new trial that they had seen deceased with a knife similar to that claimed to have been found by Wall, which knife had a blade about four inches long, and was known as a Texas jack-knife.

Upon the issue of apparent danger raised by appellant's evidence the court instructed the jury as follows: "* * * if you believe from the evidence, or have a reasonable doubt thereof, that deceased was advancing on defendant or made a move as if to draw a weapon, then you are instructed that the defendant was not required to wait until deceased actually began an attack or assault upon him, but had the right to kill deceased if such acts and all the other facts and circumstances in evidence, viewed from the defendant's standpoint at the time, caused defendant to have a reasonable expectation or fear of death or serious bodily injury." Many authorities may be found holding that the State is entitled to prove that deceased was unarmed at the time of the homicide in support of the theory that he was not the aggressor or that he was not reaching for a weapon when killed. (Branch's Ann. Texas P. C., p. 1083, Sec. 1931, and authorities there cited). Evidently the position of the State in the present case was that Sisk was not armed, therefore, was not the aggressor and did not do the things which appellant claimed caused him to believe he was

in danger. If appellant could have shown by direct testimony that Sisk was at the time of the homicide armed with a knife like that claimed to have been found by Wall, it would have been permissible as calculated to support appellant's testimony and claim as to the conduct of deceased. It follows that the same proof may be made by circumstantial evidence. See Lilly v. State, 20 Texas App., 1. If claimed newly discovered evidence tends to establish that deceased was armed at the time of the homicide, where appellant raises the issue of self-defense, a new trial should be granted if the claimed new evidence, (1) was unknown to appellant and his counsel before the trial, (2) that the failure to discover it was not due to want of diligence, (3) that it was probably true and of such character as would probably bring about a different result on another trial. The facts detailed by the witness Wall, if true, exclude the idea that the evidence could have been known to appellant or his attorney. It not being claimed by appellant that he saw a knife in deceased's hand or pocket at the time of the homicide would not call for the same diligence in a search for such weapon as would have been demanded had such weapon been seen, but not found on the body of deceased. The materiality of the new testimony is not debatable. As bearing on its probable truth we note that two witnesses testified on the hearing of the motion for new trial that they had seen deceased with a similar knife shortly before the homicide, and also call attention to the rather unusual request made by deceased to the witness Wyatt within five or ten minutes after the shooting, telling Wyatt to look around on the ground and in the car and see if he could see any knife, pistol, or other weapon. Supporting appellant's contention that a new trial should have been awarded him we cite Clark v. State, 51 Texas Crim. Rep., 519. There accused had claimed upon the trial that he thought deceased had a pistol and was attempting to draw it at the time accused killed him, but no pistol was found on deceased's body. The newly discovered evidence was that two witnesses would testify that directly after the killing they saw a pistol in deceased pocket. The court said: "* * * While appellant alone of all the witnesses testified to a demonstration on the part of deceased as if to draw a pistol, this evidence must have challenged the credulity of the jury. We are not prepared to say that the fact of the subsequent discovery of a pistol on the body of deceased may not have been calculated to support appellant's testimony and his theory, with the jury. Therefore we believe that the motion for new trial should have been granted." In

the present case no witness save appellant testified to the conduct of deceased which appellant claims put him in fear of his life, and the newly discovered testimony was calculated to support appellant's theory of the transaction. See Barrett v. State, 98 Texas Crim. Rep., 627, 267 S. W., 511; Russell v. State, 92 Texas Crim. Rep., 114, 242 S. W., 217.

We are not inclined to believe any error occurred in receiving in evidence the dying declaration. Specific objection was made to the latter part regarding the statement claimed to have been made by appellant in reply to deceased's call for help to the negro who was running the stalk cutter. Admitting it in evidence appears not in conflict with the general rule regarding dying declarations. The action of the court is supported by Walker v. State, 88 Texas Crim. Rep., 389, 227 S. W., 308. Medina v. State, 43 Texas Crim. Rep., 52, 63 S. W., 331.

For the error in overruling the motion for new trial on the ground of newly discovered evidence, the judgment is reversed and the cause remanded.

*Reversed and remanded.*